[No. 8787. *En Banc.* September 10, 1910.]

## THE STATE OF WASHINGTON, *Respondent*, v. MARTIN STRASBURG, *Appellant*.[1]

INSANE PERSONS—CRIMINAL LAW—INTENT. Under the common law, intent was necessary to constitute a criminal act, and hence an insane person incapable of forming a criminal intent was not responsible for crime.

JURY—RIGHT TO JURY TRIAL. Const., art. 1, § 21, providing that the right to trial by jury shall remain inviolate, means that the right, as it existed in the territory when the constitution was adopted, shall continue unimpaired and inviolate.

INSANE PERSONS—CRIMINAL LAW—QUESTION OF FACT. The question of the insanity of the accused at the time of the commission of the act charged is one of fact.

CONSTITUTIONAL LAW—DUE PROCESS—CRIMINAL LAW—RIGHT TO JURY TRIAL. The "due process clause" of the constitution taken in connection with art. 1, § 21, providing that the right to trial by jury shall remain inviolate, means that there can be no due process depriving one of life or liberty upon a criminal charge without a trial by jury as the right existed in the territory at the time of the adoption of the constitution, upon all questions of fact, and this includes the substantive fact of the sanity of the accused at the time of the act charged; hence Rem. & Bal. Code, § 2259, providing that insanity shall be no defense to crime, and that no evidence thereof shall be admitted, is void.

CRIMINAL LAW—INTENT—INSANITY. The power of the legislature to eliminate the element of intent in defining crime cannot be exercised to the extent of preventing an accused from invoking the defense of insanity at the time the act was committed and excluding evidence thereof.

SAME—"PUNISHMENT." The theory that "punishment" for crime is not within the present-day humanitarian conception of the proper treatment of criminals, and is contrary to the spirit of modern law, cannot uphold a statute authorizing the restraint of the criminal insane, where the act provides that such person be "punished" by imprisonment.

CRIMINAL LAW—INSANITY—RESPONSIBILITY—PROCEDURE—TRIAL—STATUTES—CONSTRUCTION. Construing together Rem. & Bal. Code, § 2259, providing that insanity is no defense to crime, and § 2283,

[1]Reported in 110 Pac. 1020.

providing that whenever, in the judgment of the court trying the same, any person convicted of a crime shall have been at the time of its commission, unable, by reason of insanity to comprehend the nature of the act, the court may direct such person to be confined in a state hospital for treatment, and providing for the determination of the question of sanity by the court, it will be held, in order to sustain the constitutionality of the act, that the legislature did not intend to punish an insane person for crime, but only intended to change the method for determining the issue of insanity.

CONSTITUTIONAL LAW—DUE PROCESS—LAW OF THE LAND. By "due process" and "the law of the land", is meant that life, liberty and property are to be held under the protection of the general rules that govern society.

SAME—DUE PROCESS—INSANE PERSONS—TRIAL OF ISSUE—NOTICE—PROCEEDINGS. Rem. & Bal. Code, § 2283, is lacking in every essential requirement of due process of law, in that it provides that a person charged with crime and insane at the time of the act charged, may, in the discretion of the court, without any charge of insanity, notice or trial, or opportunity to be heard in his defense, upon the courts own observation, or upon evidence *de hors* the record, upon any procedure adopted by the court, be committed to a hospital and deprived of his liberty.

CRIMINAL LAW—INTENT—POLICE POWER—INSANE PERSONS. While, under the police power, the legislature has a broad discretion in eliminating the element of intent in defining crime, a penal law fixing criminal responsibility upon the insane exceeds constitutional restraints; since a penal law is invalid where it punishes a man for an act which the utmost care and circumspection on his part would not enable him to avoid.

INSANE PERSONS—RESTRAINT—PUNISHMENT. An act providing punishment for the criminal insane by restraint beyond the necessities of protection to society after the complete restoration to sanity, is void.

MORRIS, J., dissents in part.
FULLERTON, J., dissents.

Appeal from a judgment of the superior court for King county, Gilliam, J., entered October 23, 1909, upon a trial and conviction of assault in the first degree. Reversed.

*Alfred Gfeller* and *Wm. A. Holzheimer*, for appellant, to the point that insanity is a defense to crime, cited: 4, Blackstone, chap. 2, § 22; 4 Hammond Blackstone, chap. 2, §§ 24,

25; Broom, Legal Maxims (8th ed.), p. 14; *People v.*
*Kleim*, 2 Lawson Crim. Defenses 36; *Freeman v. People*, 4
Denio (N. Y.) 9, 47 Am. Dec. 216; *State v. Marler*, 2 Ala.
43, 36 Am. Dec. 398, 402, and note; *State ex rel. Mackin-*
*tosh v. Superior Court*, 45 Wash. 248, 88 Pac. 207; *State*
*v. Jones*, 50 N. H. 369, 9 Am. Rep. 242. The question of
insanity is one of fact to be tried by a jury. *State v. Jones,*
*Freeman v. People* and *State ex. rel. Mackintosh v. Superior*
*Court, supra.*

*George F. Vanderveer*, for respondent, contended, among
other things, that the police power vests in the legislature
the power to define crime. Freund, Police Power; Tiedeman,
Limitations of Police Power; *State v. Brown*, 37 Wash. 97,
79 Pac. 635, 107 Am. St. 798, 68 L. R. A. 889; *State ex rel.*
*Richey v. Smith*, 42 Wash. 237, 84 Pac. 851, 114 Am. St.
114, 5 L. R. A. (N. S.) 674; *Karasek v. Peier*, 22 Wash. 419,
61 Pac. 33, 50 L. R. A. 345; *In re Aubrey*, 36 Wash. 308,
78 Pac. 900, 104 Am. St. 952; *People v. Budd*, 117 N. Y. 1,
22 N. E. 670, 15 Am. St. 460, 5 L. R. A. 559; *State v.*
*Moore*, 104 N. C. 714, 10 S. E. 143, 17 Am. St. 696; *Mugler*
*v. Kansas*, 123 U. S. 623; *State v. Richcreek*, 167 Ind. 217,
77 N. E. 1085, 119 Am. St. 491, 5 L. R. A. (N. S.) 874.
Intent is not a necessary element of crime. *Morgan v. Nolte,*
37 Ohio St. 23, 41 Am. Rep. 485; *State v. Constatine*, 43
Wash. 102, 86 Pac. 384, 117 Am. St. 1043; *Colby v. Backus,*
19 Wash. 347, 53 Pac. 367, 67 Am. St. 732; *State v. Glinde-*
*mann*, 34 Wash. 221, 75 Pac. 800, 101 Am. St. 1001; *State*
*v. Zenner*, 35 Wash. 249, 77 Pac. 191. The plea of insanity
under this statute belongs to the class of pleas in bar of
sentence, and need not be submitted to a jury. *Baughn v.*
*State*, 100 Ga. 554, 28 S. E. 68, 38 L. R. A. 577; *Nobles v.*
*Georgia*, 168 U. S. 398.

*E. C. Hughes, Harold Preston, H. W. Craven, Milo A.*
*Root*, and *George E. de Steiguer, amici curiae.* No insane
man can be guilty of crime. *State ex rel. Mackintosh v.*

*Superior Court,* 45 Wash. 248, 88 Pac. 207; *In re Boyett,*
136 N. C. 415, 48 S. E. 789, 103 Am. St. 944, 67 L. R. A.
972; *State v. Brown* (Utah), 102 Pac. 641; *Dexter v. Hall,*
15 Wall. 9; *People v. Farrell,* 31 Cal. 576. The police
power is not without limitations, and the legislature may
not so define a crime that with one person intent is essential,
and with another it is not. The law is unequal and arbitrary.
*In re Langford,* 57 Fed. 570; *Leeper v. Texas,* 139 U. S. 462;
*Missouri v. Lewis,* 101 U. S. 22; *Taylor v. Porter,* 4 Hill
(N. Y.) 140, 40 Am. Dec. 274; *Connolly v. Union Sewer
Pipe Co.,* 184 U. S. 540; *Commonwealth v. International
Harvester Co.,* 131 Ky. 551, 115 S. W. 703, 133 Am. St.
256; *In re Kemmler,* 136 U. S. 436; *In re Finley,* 1 Cal. App.
198, 81 Pac. 1041; *Ho Ah Kow v. Nunan,* Fed. Case No.
6,546; *State v. Lewin,* 53 Kan. 679, 37 Pac. 168; *Wally's
Heirs v. Kennedy,* 10 Tenn. 554, 24 Am. Dec. 511; *People
v. McCann,* 16 N. Y. 58, 69 Am. Dec. 642. Insane persons
under this act do not receive the equal protection of the laws,
being left to the arbitrary will of the judge. *Underwood v.
People,* 32 Mich. 1, 20 Am. Rep. 633; *In re Brown,* 39 Wash.
160, 81 Pac. 552, 109 Am. St. 868, 1 L. R. A. (N. S.) 540;
*In re Boyett, supra; State ex rel. Blaisdell v. Billings,* 55
Minn. 467, 57 N. W. 206, 794, 43 Am. St. 524. A judicial
inquiry into a person's sanity is essential to due process of
law. 16 Am. & Eng. Ency. Law (2d ed.), p. 599; Black,
Constitutional Law, 399; *In re Lambert,* 134 Cal. 626, 66
Pac. 851, 86 Am. St. 296, 55 L. R. A. 856; *Evans v. Johnson,*
39 W. Va. 299, 19 S. E. 623, 45 Am. St. 912, 23 L. R. A.
737; *Marbury v. Madison,* 1 Cranch 137; *Yick Wo. v. Hop-
kins,* 118 U. S. 356; *People ex rel. Witherbee v. Supervisors,*
70 N. Y. 228; *Ex parte Murray,* 35 Fed. 496; *Stuart v.
Palmer,* 74 N. Y. 183, 30 Am. Rep. 289. The essential ele-
ments of due process of law are notice and opportunity to
defend. Black, Const. Law, pp. 424, 425, § 153; *Simon v.
Craft,* 182 U. S. 427; *Phillips v. Postal Telegraph Cable Co.,*
130 N. C. 513, 41 S. E. 1022, 89 Am. St. 868; *Portland v.*

*Bangor,* 65 Maine 120, 20 Am. Rep. 681; *Walker v. Sauvi-net,* 92 U. S. 90; *People ex rel. Sullivan v. Wendel,* 33 Misc. Rep. 496, 68 N. Y. Supp. 948; *Davis v. United States,* 160 U. S. 469; *Wright v. Cradlebaugh,* 3 Nev. 341; *Charles v. City of Marion,* 98 Fed. 166; *Underwood v. People,* 32 Mich. 1, 20 Am. Rep. 633; *Jolliffe v. Brown,* 14 Wash. 155, 44 Pac. 149, 53 Am. St. 868; *State v. Divine,* 98 N. C. 778, 4 S. E. 477; *In re Boyett,* and *State ex rel. Mackintosh v. Superior Court, supra.* The defendant was deprived of his right to trial by jury. *Cummings v. Missouri,* 4 Wall. 277; *In re Tiburcio Parrott,* 1 Fed. 481; *Railroad Tax Cases,* 13 Fed. 722, 732, 778; *Joseph v. Randolph,* 71 Ala. 499; *Wynehamer v. People,* 13 N. Y. 378; *State ex rel. Richey v. Smith,* 42 Wash. 237, 84 Pac. 851, 114 Am. St. 114, 5 L. R. A. (N. S.) 674. The law imposes cruel punishment. 12 Cyc. 963; *Ho Ah Kow v. Nunan, supra;* Cooley, Constitutional Limitations (6th ed.), 402; Tiedeman, Limitations of Police Power, p. 21; *State v. Becker,* 3 S. D. 29, 51 N. W. 1018; *In re Finley, supra; State v. Driver,* 78 N. C. 423; *State v. Williams,* 77 Mo. 310; *McMahon v. State,* 70 Neb. 722, 97 N. W. 1035; *In re McDonald,* 4 Wyo. 150, 33 Pac. 18, 21; *Thomas v. Kincaid,* 55 Ark. 502, 18 S. W. 854, 29 Am. St. 68, 15 L. R. A. 558; *Johnson v. Waukesha Co.,* 64 Wis. 281, 25 N. W. 7; *State v. Burton,* 27 Wash. 528, 67 Pac. 1097; *State v. Bliss,* 27 Wash. 463, 68 Pac. 87; *State v. Mobley,* 44 Wash. 549, 87 Pac. 815.

PARKER, J.—The prosecuting attorney for King county by information charged the defendant with the crime of assault in the first degree, as follows:

"He, said Martin Strasburg, in the county of King, state of Washington, on the 3d day of September, A. D. 1909, did wilfully, unlawfully and feloniously make an assault upon one Otto Peeck with a firearm, to wit, with a revolver-pistol, then and there loaded with powder and ball, which he, said Martin Strasburg, then and there had and held, and did then and there wilfully, unlawfully and feloniously, with said

revolver-pistol, shoot at, toward and into the body of said Otto Peeck, with intent then and there wilfully, unlawfully and feloniously to kill said Otto Peeck."

The offense charged by this information is defined by § 2413 of Rem. & Bal. Code, as follows:

"Every person who, with intent to kill a human being, or to commit a felony upon the person or property of the one assaulted, or of another, shall assault another with a firearm or any deadly weapon, or by any force or means likely to produce death; . . . shall be guilty of assault in the first degree and shall be punished by imprisonment in the state penitentiary for not less than five years."

The trial resulted in a verdict of guilty against the defendant. His motion for a new trial being denied, judgment and sentence was rendered against him upon the verdict. From this judgment, the defendant has appealed.

The principal grounds relied upon by learned counsel for defendant to secure a reversal of the judgment are that the trial court erred in refusing to admit evidence tending to prove that the defendant, at the time charged as the commission of the crime, was insane and incapable of understanding the nature and quality of his act; and, also, that the court erred in instructing the jury, "that under the laws of this state it is no defense to a criminal charge that the person charged was at the time of the commission of the offense unable, by reason of his insanity, idiocy or imbecility, to comprehend the nature and quality of the act committed, or to understand that it was wrong."

In support of these rulings of the learned trial court, counsel for the state rely upon the provisions of § 7 of our new criminal code, Laws of 1909, p. 892; Rem. & Bal. Code, § 2259, providing as follows:

"It shall be no defense to a person charged with the commission of a crime, that at the time of its commission, he was unable by reason of his insanity, idiocy or imbecility, to comprehend the nature and quality of the act committed, or

to understand that it was wrong; or that he was afflicted with a morbid propensity to commit prohibited acts, nor shall any testimony or other proof thereof be admitted in evidence."

It is contended by learned counsel for appellant that this statute withholds from him rights guaranteed by our state constitution, and particularly those rights .guaranteed by the following provisions thereof:

Art. 1, Sec. 3. "No person shall be deprived of life, liberty, or property without due process of law."

Art. 1, Sec. 21. "The right of trial by jury shall remain inviolate."

We are then confronted with the novel and grave question: Has the legislature the power under our constitution to enact a law taking away from a defendant accused of crime the opportunity to show in his defense the fact that, at the time of the commission of the act charged as a crime against him, he was insane, and by reason thereof was unable to comprehend the nature and quality of the act committed? We are not advised of any instance where the legislative power of any common law country has ever enacted a law prohibiting all consideration by the jury of the question of the insanity of the accused at the time of the commission of the act relied upon as the offense charged against him, when such insanity is sought to be shown in his behalf in connection with the question of his guilt. We believe it reasonably safe to assert that this is the first instance of any such enactment. This fact, of course, is not within itself a reason for holding that the legislature of our state has no such power; but in view of the source of our jurisprudence and the spirit of our institutions, this fact does furnish a reason for us to view this assumption of power with grave concern, and for a more than ordinary critical examination of its alleged source. This is indeed an occasion for heeding the admonition of the concluding section of our constitutional bill of rights, which reads:

"A frequent recurrence to fundamental principles is es-

sential to the security of individual rights and the perpetuity of free government." Constitution, art. 1, § 32.

At the outset, then, let us recur to some fundamental principles touching the effect of the insanity of one accused of crime, at the time of committing the act charged against him, upon the question of his guilt. It is possible we may thus discover that the mental responsibility of the accused is a fact entering into the question of his guilt upon which he has a right of trial by jury, the same as upon any other fact inherent in that question; even as the fact that the muscular action of his physical body did or did not commit the physical act charged as a crime against him. In the text of Blackstone's Commentaries, vol. 4, pages 20, 21, and 24, it is stated:

"All the several pleas and excuses which protect the committer of a forbidden act from the punishment which is otherwise annexed thereto may be reduced to this single consideration, the want or defect of *will*. An involuntary act, as it has no claim to merit, so neither can it induce any guilt; the concurrence of the will, when it has its choice either to do or to avoid the fact in question, being the only thing that renders human actions either praiseworthy or culpable. Indeed, to make a complete crime cognizable by human laws, there must be both a will and an act. . . .

"The second case of a deficiency in will, which excuses from the guilt of crimes, arises also from a defective or vitiated understanding, viz., in an *idiot* or a *lunatic*. For the rule of law as to the latter, which may easily be adapted also to the former, is, that 'furiosus furore solum punitur.' In criminal cases, therefore, idiots and lunatics are not chargeable for their own acts, if committed when under these incapacities: no, not even for treason itself."

In 1 Russell on Crimes, page 2, it is said:

"Without the consent of the *will*, human actions cannot be considered as culpable; nor where there is no will to commit an offense, is there any just reason why a party should incur the penalties of a law made for the punishment of crimes and offenses."

8—60 WASH.

The doctrine as understood in the United States is stated in 16 Am. & Eng. Ency. Law (2d ed.), p. 618, as follows:

"From the earliest period of the common law, no criminal responsibility could attach where the accused was so utterly deprived of reason as to be incapable of forming a guilty or criminal intent."

This is in accord with the view of our leading American text writers: 1 Wharton, Criminal Law (10th ed.), § 33; 1 Bishop, New Criminal Law, § 375; 1 McClain, Criminal Law, § 154. Mr. Tiedeman, in his work on State and Federal Control of Persons and Property, § 47, says:

"It is probably the rule of law in every civilized country, that no insane man can be guilty of a crime, and hence cannot be punished for what would otherwise be a crime. The ground for this exception to criminal responsibility is, that there must be a criminal intent, in order that the act may constitute a crime, and that an insane person cannot do an intentional wrong. Insanity, when it is proven to have existed at the time when the offense was committed, constitutes a good defense, and the defendant is entitled to acquittal."

In the case of *Commonwealth v. Rogers*, 7 Met. 500, 41 Am. Dec. 458, Chief Justice Shaw, speaking for the supreme judicial court of Massachusetts, said:

"In order to constitute a crime, a person must have intelligence and capacity enough to have a criminal intent and purpose; and if his reason and mental powers are either so deficient that he has no will, no conscience or controlling mental power, or if, through the overwhelming violence of mental disease, his intellectual power is for the time obliterated, he is not a responsible moral agent, and is not punishable for criminal acts."

Mr. Freeman, the able editor of the American Decisions, in his note to *State v. Marler* (2 Ala. 43), 36 Am. Dec. 402, says:

"It was always a settled rule of the common law that a person could not be legally punished for any act committed by him while he was insane. . . . The common law never intended to inflict punishment upon one whom it believed to be insane

at the time when he did the act charged as a crime. For the law holds that a criminal intent is an essential element in every crime, and if by reason of insanity a person be incapable of forming any intent, he cannot be regarded by the law as guilty."

In 12 Cyc. 164, the doctrine is stated in the text, in substantial accord with the above quotations, and there supported by a great array of cited authorities. Indeed, they are apparently unanimous. The doctrine has been recognized by our territorial supreme court, as well as by this court. *McAllister v. Territory*, 1 Wash. Ter. 360; *State ex rel. Mackintosh v. Superior Court*, 45 Wash. 248, 88 Pac. 207.

We have quoted from and cited authorities upon this question to this extent in order to show, not only how firmly fixed in our system of jurisprudence was this doctrine of incapacity of insane persons to commit crime at the time of the enactment of our criminal code of 1909, but, also, to conclusively show that, at the time of the adoption of our constitution, preserving the right of trial by jury inviolate, this doctrine was in full force in the territory of Washington as a part of the common law, unimpaired by judicial decision or legislative enactment. Referring to the declaration of our constitution that the right of trial by jury shall remain inviolate, this court, in *State ex rel. Mullen v. Doherty*, 16 Wash. 382, 384, 47 Pac. 958, 58 Am. St. 39, said:

"The effect of the declaration of the constitution above set out is to provide that the right of trial by jury as it existed in the territory at the time when the constitution was adopted should be continued unimpaired and inviolate. *Whallon v. Bancroft*, 4 Minn. 109; *State ex rel. Clapp v. Minn. Thresher Mfg. Co.*, 40 Minn. 213, 41 N. W. 1020; *Taliaferro v. Lee*, 97 Ala. 92, 13 South. 125."

This appears to be the rule generally recognized by the authorities. 24 Cyc. 102.

From what has been said thus far, it seems too plain for argument that one accused of crime had the right, prior to and at the time of the adoption of our constitution, to show,

as a fact in his defense, that he was insane when he committed the act charged against him, the same as he had the right to prove any other fact tending to show that he was not responsible for the act. Indeed, his right to prove his insanity at the time of committing the act was as perfect even as his right to prove that his physical person did not commit the act, or set in motion a chain of events resulting in the act. These considerations suggest the application to our inquiry of the maxim, *"An act done by me against my will is not my act."* 1 Bishop, New Criminal Law, § 288. The question of the insanity of the accused at the time of committing the act charged being one of fact when sought to be shown in his behalf, it needs no citation of authorities other than the foregoing to demonstrate that it is, and always has been, a question of fact for the jury to determine; as much so as any other question of fact bearing upon the responsibility of the accused for the occurrence of the act relied upon as constituting the offense charged. Such, beyond all question, was the right of all persons accused of crime at the time of, and prior to, the adoption of our constitution.

Our problem then is reduced to the question: Can the legislature under our constitution so circumscribe inquiry touching the question of the guilt of the accused as to exclude all consideration by the jury of his insanity at the time of committing the act? Now, this right of trial by jury which our constitution declares shall remain inviolate must mean something more than the preservation of the mere form of trial by jury; else the legislature could, by a process of elimination in defining crime or criminal procedure, entirely destroy the substance of the right by limiting the questions of fact to be submitted to the jury. In the case of *Cummings v. State of Missouri*, 71 U. S. 277, 325, Justice Field said: "The constitution deals with substance, not shadows. Its inhibition was leveled at the thing, not the name. . . . If the inhibition can be evaded by the form of the enactment, its insertion in the fundamental law was a vain and futile proceeding." The

correctness of this statement is too self-evident to require comment.

The due process of law provision of our constitution above quoted probably does not, of itself, mean right of trial by jury; but it does mean, in connection with the provision "The right of trial by jury shall remain inviolate", that there can be no such thing as due process of law in depriving one of life or liberty upon a criminal charge, except by a jury trial in which the accused may be heard and produce evidence in his defense, as that right existed at the time of the adoption of our constitution. It is not easy to define in general terms "due process of law" with such precision that we may at once see the exact limit of legislative power fixed by these words in the constitution; nor is it easy to define in general terms "the right of trial by jury", as guaranteed by the constitution, so that we may readily determine, in all cases, whether or not the legislature has violated this right. But in any event, it is clear that we must look beyond the letter, and give consideration to the spirit, of these provisions before we can hope to discover their true meaning. Judge Cooley, in commenting upon the phrases "due process of law", and "the law of the land", which he regards as meaning the same thing, in his Constitutional Limitations (7th ed.), 502, observes:

"If we examine such definitions of these terms as are met with in the reported cases, we shall find them so various that some difficulty must arise in fixing upon one which shall be accurate, complete in itself, and at the same time appropriate in all the cases. The diversity of definition is certainly not surprising, when we consider the diversity of cases for the purposes of which it has been attempted, and reflect that a definition that is sufficient for one case and applicable to its facts may be altogether insufficient or entirely inapplicable in another.

"Perhaps no definition is more often quoted than that given by Mr. Webster in the Dartmouth College case: 'By the law of the land is most clearly intended the general law; a law which hears before it condemns; which proceeds upon inquiry, and renders judgment only after trial. The meaning is that

every citizen shall hold his life, liberty, property, and immunities, under the protection of the general rules which govern society. Everything which may pass under the form of an enactment is not therefore to be considered the law of the land.'

"The definition here given is apt and suitable as applied to judicial proceedings, which cannot be valid unless they 'proceed upon inquiry' and 'render judgment only after trial.' "

The concluding words of this quotation seem very comprehensive; but they do not fully answer the problem we are here confronted with. The words "proceed upon inquiry" suggest the further question, inquiry of what? May such inquiry be so limited as to exclude therefrom any fact or facts the will of the legislature may dictate? If so, then the inquiry may be narrowed by the legislative will, to the ascertainment of some insignificant fact or facts by the jury, and the state still be able to successfully contend that the right of trial by jury has been preserved. This cannot be. The right of trial by jury must mean that the accused has the right to have the jury pass upon every substantive fact going to the question of his guilt or innocence. Otherwise this provision of our constitution, found, also, in varying language in all the constitutions of the Union, state and Federal—treasured by a free people for generations as one of the principal safeguards of their liberties—would be rendered void and utterly fail in the purpose which our people have always believed it was intended to accomplish.

Black, on Constitutional Law (2d ed.), 519, says:

"The constitutions were intended not merely to secure the right of trial by jury, but also to insure that it should be continued in existence as a substantial and valuable protective right to private suitors. Now it is evident that it would be entirely feasible for a state legislature, if so minded, to impose such onerous and oppressive restrictions or conditions upon this right as to make it practically unavailing to a party for his protection, yet without denying it in express terms. But this would be a palpable violation of the spirit

and intent of the constitutional provision, and the courts would hold any such restrictions upon the right as not less unconstitutional than the total denial of it."

In the case of *People ex rel. Witherbee v. Supervisors,* 70 N. Y. 228, 234, Judge Folger, speaking for the New York court of appeals, said:

"Due process of law requires, that a party shall be properly brought into court, and that he shall have an opportunity when there, to prove any fact which, according to the constitution and the usages of the common law, would be a protection to him or his property."

This language was quoted with approval by the supreme court of Minnesota in *State ex rel. Blaisdell v. Billings,* 55 Minn. 467, 57 N. W. 206, 794, 43 Am. St. 524; *Plimpton v. Town of Somerset,* 33 Vt. 283; *King v. Hopkins,* 57 N. H. 334, 352; *Wynehamer v. People,* 13 N. Y. (3 Kernan), 378, 442.

We believe enough has been said to show that the sanity of the accused, at the time of committing the act charged against him, has always been regarded as much a substantive fact, going to make up his guilt, as the fact of his physical commission of the act. It seems to us the law could as well exclude proof of any other substantive fact going to show his guilt or innocence. If he was insane at the time to the extent that he could not comprehend the nature and quality of the act—in other words, if he had no will to control the physical act of his physical body, how can it in truth be said that the act was his act. To take from the accused the opportunity to offer evidence tending to prove this fact, is, in our opinion, as much a violation of his constitutional right of trial by jury as to take from him the right to offer evidence before the jury tending to show that he did not physically commit the act or physically set in motion a train of events resulting in the act. The maxim "An act done by me against my will is not my act," may, without losing any of its force, be paraphrased to fit our present inquiry as follows: "An act done

by me without my will, or in the absence of my will, is not my act."

Learned counsel for the state contend that the legislature has the power to eliminate the element of intent from any and all crimes, and that it can provide punishment for the commission of any act it chooses to define as criminal, regardless of the intent or want of intent with which such act may be committed. In support of this contention, we are cited to instances of laws relating to the sale of liquor to minors and Indians, and living off the earnings of a prostitute, and incest; under which it has been held that the want of intent on the part of the accused, and want of knowledge on his part as to the age or relationship of the person in connection with whom he commits the prohibited act, does not excuse him; as in *State v. Glindemann*, 34 Wash. 221, 75 Pac. 800, 101 Am. St. 1001; *State v. Zenner*, 35 Wash. 249, 77 Pac. 191; *State v. Constatine*, 43 Wash. 102, 86 Pac. 384, 117 Am. St. 1043. No doubt many other instances of this character might be cited; but none have been called to our attention, and we think the books do not contain any, where the constitutionality of a law has been sanctioned which conclusively imputes intent to commit crime to an insane person or withholds from him the right to prove in his defense that he was insane at the time of committing the act. It seems too elementary to call for citation of authorities to show that the general rule is now and has been for centuries, at least in all common law countries, that "there can be no crime without a criminal intent." *State v. Constatine, supra*; 4 Blackstone, 20; 1 Bishop, New Criminal Law, § 287; 1 McClain, Criminal Law, § 112. In a note to *People v. Flack* (125 N. Y. 324, 26 N. E. 267), 11 L. R. A. 807, the learned editor has collated authorities illustrating the rule and its exceptions.

While the general rule is subject to some exceptions, seemingly enabling the legislative power to eliminate the element of intent from certain crimes, as indicated by some of our previous holdings, it does not logically follow therefrom that

an insane person can be rendered amenable to the *criminal laws* of the state, as long as those laws have in them the element of punishment, which we will notice later. We italicize the words *"criminal laws"*, for we desire to emphasize the fact that we have not for a moment considered or had in mind what may be done in the way of restraining and caring for the insane under those humane laws enacted for that purpose, which, if not now sufficient to protect society and the insane, can easily be made so without infringing any constitutional right, by virtue of the abundant power residing in the legislature. We are now only concerned with the question of whether or not one accused of crime may be branded as a felon without any consideration whatever, by the jury trying him, of the question of his insanity at the time of committing the act charged against him. Whatever the power may be in the legislature to eliminate the element of intent from criminal liability, we are of the opinion that such power cannot be exercised to the extent of preventing one accused of crime from invoking the defense of his insanity at the time of committing the act charged, and offering evidence thereof before the jury. One so accused had this right at the time of the adoption of our constitution, and we are of the opinion that the question is so inherently related to the guilt or innocence of all accused persons that it cannot be now taken away from them without violating these guarantees of the constitution.

Since we conclude that the defendant has the right to have submitted to the jury the question of whether or not he was insane at the time of committing the act charged against him in connection with and as bearing upon the question of his guilt, we need not notice the provisions of § 2283, Rem. & Bal. Code, providing for the disposition of a convicted person who, in the judgment of the court trying him, was insane at the time of committing the act for which he was convicted, further than to observe that that section does not pretend to give to the accused the right to have the question of his in-

sanity submitted to the jury in connection with, and as bear-
ing upon, the question of his guilt, but leaves the question of
his insanity entirely to the trial judge. This, of course, is
not a jury trial upon that question.

Finally, we will briefly notice the very able and ingenious
argument put forward by learned counsel for the state, based
upon the seeming assumption that the modern humane treat-
ment of those convicted of crime practically removes them
from the realm of punishment and places them in a position
but little different from those other unfortunate members of
society which the state is obliged to care for and restrain of
their liberty; not because they have committed wrong, but
because of their menace to society and themselves without
fault of their own, the insane. Learned counsel's premise
may be better understood by quoting from his brief as fol-
lows:

"The central idea upon which the whole fabric of criminal
jurisprudence was formerly built was the idea that every
criminal act was the product of a free will possessing a full
understanding of the difference between right and wrong and
full capacity to choose a right or wrong course of action,
and, as one error naturally and logically follows another, it
was only natural and logical that society should have pre-
scribed punishments as a central feature of its scheme for
correction. A better understanding of crime and the science
of criminology now convinces us that this theory is wholly
wrong,—that a dominant percentage of all criminals are not
free moral agents, but, as a result of hereditary influences or
early environments, are either mentally or morally degenerate
or their crimes are committed under the degenerating in-
fluence of intoxicating liquor. An understanding of this fact
has made readily apparent the folly of expecting that punish-
ment could relieve the condition, and accordingly stocks, whip-
ping posts and chain gangs are giving way to workhouses,
reformatories and asylums, the purpose of which is to in-
struct, educate and reform rather than further to debase the
individual; and the modern systems of criminal classification
and segregation are themselves a recognition of the fact that
every criminal is a concrete problem."

Counsel then cites certain provisions of our laws providing in a measure for the classification and treatment of those convicted of crime, and continuing, argues that the purpose of these laws, "is to put in operation in this state a scheme of criminal jurisprudence which gives recognition to these ideas." The argument seems to be, in its last analysis, that because of modern humane methods in caring for and treating those convicted of crime, there is no longer any reason for taking into consideration the element of will on the part of those who commit prohibited acts, when their guilt is being determined for the purpose of putting them in the criminal class for restraint and treatment. Learned counsel's premise suggests a noble conception, and may give promise of a condition of things towards which the humanitarian spirit of the age is tending; yet the stern and awful fact still remains, and is patent to all men, that the status and condition, in the eyes of the world and under the law, of one convicted of crime is vastly different from that of one simply adjudged insane. We cannot shut our eyes to the fact that the element of punishment is still in our criminal laws. It is evidenced by the words *"shall be punished,"* found in this very section defining the crime here charged against appellant. It is evidenced by these or similar words characterizing the treatment which the law imposes upon those convicted of crime, in practically all parts of our criminal code prescribing the fate of the guilty. As long as this is the spirit of our laws, though it may be much mellowed in the treatment of the convicted, as compared with former times, the constitutional rights here invoked must be given full force and effect when an accused person is put upon trial to determine the question of his guilt of crime. We regret the necessity of holding that the legislature has exceeded its constitutional power; but we cannot escape the conclusion that § 2259, Rem. & Bal. Code, Laws of 1909, p. 891, § 7, has the effect of depriving the appellant of liberty without due process of law, especially

in that it deprives him of the right of trial by jury; and is therefore unconstitutional.

The judgment of the learned trial court is reversed, with direction to grant appellant a new trial.

CROW, and MOUNT, JJ., concur.

RUDKIN, C. J. (concurring)—Before discussing the validity of the legislative act under consideration, it becomes important to determine what the legislature has done, or attempted to do. Section 7 of the criminal code of 1909 (Rem. & Bal. Code, § 2259), declares that:

"It shall be no defense to a person charged with the commission of a crime, that at the time of its commission, he was unable by reason of his insanity, idiocy or imbecility to comprehend the nature and quality of the act committed, or to understand that it was wrong; or that he was afflicted with a morbid propensity to commit prohibited acts; nor shall any testimony or other proof thereof be admitted in evidence."

If the act stopped here, there could be no question as to the legislative intent. For the first time in history, so far as we are advised, the legislature of a civilized state has attempted to place the idiot, who hath no understanding from his nativity, the imbecile and the insane, who have lost their understanding through disease or mental decay, and the sane man in the full possession of all his mental faculties, on an equal footing before the criminal law. But the legislature did not stop here. Section 31 of the act (Rem. & Bal. Code, § 2283), provides that:

"Whenever, in the judgment of the court trying the same, any person convicted of a crime shall have been at the time of its commission unable by reason of his insanity, idiocy or imbecility, to comprehend the nature and quality of his act, or to understand that it was wrong, or shall be at the time of his conviction or sentence insane or an idiot, or imbecile, such court may in its discretion direct that such person be confined for treatment in one of the state hospitals for the insane or in the insane ward of the state penitentiary,

until such person shall have recovered his sanity. In determining whether any person convicted of a crime was at the time of the commission thereof unable by reason of his insanity, idiocy or imbecility to comprehend the nature and quality of his act, or to understand that it was wrong, or is at the time of his conviction or sentence insane or an idiot or imbecile, the court may take counsel with one or more experts in the diagnosis and treatment of insanity, idiocy and imbecility, and make such personal or other examination of the defendant as in his judgment may be necessary to aid in the determination."

·  When these two sections are construed together, we are prone to believe that the legislature did not intend to punish one for the commission of a crime, when by reason of his insanity, idiocy or imbecility, he was unable to comprehend the nature and quality of his act, or to understand that it was wrong; but rather that it intended to minimize the well-known evil resulting from the all too frequent interposition of the defense of insanity in homicide cases, where no other defense is available, by changing the time and mode of trial of the issue of insanity.

We reach this conclusion the more readily for the reason that any other construction of the statute would bring it in conflict with the constitution. Assuming, therefore, for the present, that the legislature simply intended to change the time and mode of trial of the issue of insanity, § 2283, *supra*, is lacking in every essential requirement of due process of law. No attempt has ever been made to give a complete and exhaustive definition of the phrase, "due process of law," or its equivalent, "the law of the land," and it has been said by the supreme court of the United States that it is the part of wisdom to leave their meaning to be evolved by the gradual process of judicial inclusion and exclusion as the case presented for decision shall require. *Davidson v. New Orleans,* 96 U. S. 97. The exposition, however, of the term, "due process of law," or, "the law of the land," by Mr. Webster, in *Dartmouth College v. Woodward,* 4 Wheat. 518, 581, has

generally been accepted by both courts and law writers, viz.,

"By the law of the land, is most clearly intended, the general law; a law, which hears before it condemns; which proceeds upon inquiry, and renders judgment only after trial. The meaning is, that every citizen shall hold his life, liberty, property and immunities, under the protection of the general rules which govern society. Everything which may pass under the form of an enactment, is not, therefore, to be considered the law of the land."

Measured by this definition, the deficiencies in the act under consideration become at once apparent. It provides that, whenever, in the judgment of the court trying the same, any person convicted of a crime shall have been at the time of its commission unable by reason of his insanity, idiocy, or imbecility, to comprehend the nature and quality of his act, or to understand that it was wrong, or shall be at the time of his conviction or sentence, insane, or an idiot or an imbecile, such court may in its discretion direct that such person be confined for treatment in one of the state hospitals for the insane or in the insane ward of the state penitentiary, until such person shall have recovered his sanity; but how is the court to form a judgment on the question of insanity, idiocy or imbecility? No such charge is preferred against the accused, and, under the express provisions of another section of the act, no testimony or other proof of the mental condition of the accused shall be admitted in evidence. The court must therefore base its judgment on the appearance of the accused, or on other matters *de hors* the record. But aside from this, the accused has no notice of the proceedings against him, no opportunity to offer testimony, or to be heard in his defense. The court may adopt its own procedure, free from all constitutional restraints, may counsel with experts if it will, or act as its own expert if it chooses. It is almost needless to say that such a proceeding is an absolute nullity, if the question of insanity be a material one.

In *State ex rel. Blaisdell v. Billings*, 55 Minn. 467, 57 N. W. 206, 794, 43 Am. St. 524, the court had under consideration an act of the legislature of that state providing for the commitment of insane persons, and although the act was far more complete in its details than is the act now before us, it was held that it violated the due process clause of the state and Federal constitutions. In the course of its opinion, the court said:

"It follows that any method of procedure which a legislature may, in the uncontrolled exercise of its power, see fit to enact, having for its purpose the deprivation of a person of his life, liberty, or property, is in no sense the process of law designated and imperatively required by the constitution. And while the state should take charge of such unfortunates as are dangerous to themselves and to others, not only for the safety of the public, but for their own amelioration, due regard must be had to the forms of law and to personal rights. To the person charged with being insane to a degree requiring the interposition of the authorities and the restraint provided for, there must be given notice of the proceedings, and also an opportunity to be heard in the tribunal which is to pass judgment upon his right to his personal liberty in the future. There must be a trial before judgment can be pronounced, and there can be no proper trial unless there is guaranteed the right to produce witnesses and submit evidence. The question here is not whether the tribunal may proceed in due form of law and with some regard to the rights of the person before it, but, rather, is the right to have it so proceed absolutely secured? Any statute having for its object the deprivation of the liberty of a person cannot be upheld unless this right is secured, for the object may be attained in defiance of the constitution, and without due process of law. . . . We are not speaking of what every honorable and humane officer would do when a case was before him, but of what the statute will permit an officer to do."

For these reasons, if the question of insanity is at all a material one under the statute, the procedure prescribed for its determination amounts to a palpable denial of due process of law. But if we must accept the view that the legislature

intended to abrogate the defense of insanity in its entirety, and to place the sane and the insane, the idiot, and the imbecile, on an equal footing before the criminal law, we are still of opinion that the act is unconstitutional and void. The state seeks to uphold it on two grounds. First, on the ground that it is within the police power of the state to eliminate the question of intent in all criminal cases; and second, on the ground that, under modern theories, the lawbreaker is taken into custody by the state for his own amelioration and reformation, and not as a punishment for crime. In other words, that the theory of legal punishment for crime is a relic of a barbarous age. True it is that, in many cases, the person accused of crime does not intend to commit the particular act which constitutes the crime. Such is the case in involuntary manslaughter, the sale of adulterated food, the sale of intoxicating liquors to minors, habitual drunkards, or insane persons, adultery, incest, statutory rape, and other crimes that might be mentioned. In the case of involuntary manslaughter the accused does not intend to commit the homicide, but does intentionally or negligently commit the wrongful act which results in the homicide. The man who sells adulterated food or intoxicating liquors may not intend to sell the particular kind of food, or to the prescribed class, but he does intend to make the sale. The man who commits adultery may not have knowledge of the married state of his paramour, the man who commits incest may not have knowledge of his relationship to the other party to the crime, and the man who commits statutory rape may not know the age of his victim; but in all such cases the man is a free moral agent, the master of his own destiny, and has it within his power to determine whether the act he is about to commit is or is not a crime, or to refrain from its commission altogether. There is little analogy between such a man and the idiot, the imbecile, or the person who is insane to the degree defined by our statute. It will be conceded that the legislature has a broad discretion in defining and pre-

scribing punishment for crime, but broad and pervading as the police power is, it is not without constitutional limitations and restraints, and we can scarcely conceive of a valid penal law which would punish a man for the commission of an act which the utmost care and circumspection on his part would not enable him to avoid.

The argument that persons are no longer punished for their crimes is illusory and unsound. In the first place, the defense of insanity is almost invariably interposed in capital cases, where there is no other defense, and the man who is deprived of his life for crime is punished, whatever the engine of destruction may be. The man who is deprived of his liberty is also punished, and you cannot change the fact by changing the name. Liberty regulated by law is the birthright of every citizen, and liberty means freedom from arrest and restraint. It means more than this. It means freedom of action, freedom in the pursuit of any lawful business or calling, freedom in the control and use of one's property, so far as its use does not infringe upon the rights of others, and freedom in the exercise and enjoyment of all the rights, privileges and immunities of citizenship. You cannot convince the prisoner in his cell that he is not undergoing punishment for his crime, and mankind in general will share his doubts. But why should we attempt to uphold the statute on humane grounds, when it is an apparent and palpable attempt on the part of the legislature to punish those whom it fears the tribunal created by the constitution will acquit? All will agree that the unfortunate insane, who are dangerous to themselves or to others, should be restrained of their liberty for their own protection and the protection of society until the danger is removed by death or complete restoration to sanity, but few will contend or agree that they should be punished or restrained beyond this. We are not entirely without authority upon this question.

In 1899 the legislature of North Carolina passed an act which provides that:

9—60 WASH.

"When any person accused of the crime of murder . . . shall have escaped indictment, or shall have been acquitted upon the trial upon the ground of insanity, . . . the court before which such proceedings are had shall in its discretion commit such person to the hospital for the dangerous insane, to be kept in custody therein for treatment and care," etc.

And that: "No person acquitted of a capital felony on the ground of insanity and committed to the hospital for the dangerous insane shall be discharged therefrom unless an act authorizing his discharge be passed by the General Assembly."

This act was declared unconstitutional in *In re Boyett*, 136 N. C. 415, 48 S. E. 789, 103 Am. St. 944, 67 L. R. A. 972. In 1873, the legislature of Michigan passed an act providing that any person acquitted of murder and other high crimes by reason of insanity should be sentenced to confinement in the insane hospital of the state's prison, and that such person could only be discharged therefrom by the governor, upon a certificate of the medical inspector of the insane asylum, and the circuit judge of the circuit from which he was sent, that he is no longer insane. This act was also declared unconstitutional in *Underwood v. People*, 32 Mich. 1, 20 Am. Rep. 633, on the ground that it denied to the accused the protection of the due process clause of the constitution. There would seem to be little difference between a person found guilty of the commission of a crime while insane, and one found not guilty by reason of insanity, for in both cases the two facts co-exist, viz.: violation of the law and insanity. The opinion in the latter case was delivered by Judge Campbell, and concurred in by Judge Cooley and Chief Justice Graves, jurists who were certainly not lacking in humanity or in a knowledge of constitutional restraints on legislative power. In concluding his opinion, Judge Campbell said:

"It is a result of the dangers which have been multiplied by the absurd lengths to which the defense of insanity has

been allowed to go, under the fanciful theories of incompetent and dogmatic witnesses, who have brought discredit on science, and made the name of experts unsavory in the community. No doubt many criminals have escaped justice by the weight foolishly given by credulous jurors to evidence which their common sense should have disregarded. But the remedy is to be sought by correcting false notions, and not by destroying the safeguards of private liberty."

Like all things earthly, our jury system has its imperfections. Jurors are only human. Their passions and their prejudices follow them into the jury box and not infrequently find expression in their verdicts. The disposition of juries to convict on inadequate testimony in prosecutions for certain crimes has become so notorious that nearly every state legislature has found it necessary to provide that in such cases the prosecuting witness must be corroborated. On the other hand, juries will sometimes acquit when the evidence of guilt seems all but conclusive. This result usually happens where there is no public sentiment behind the prosecution, either because of the nature of the crime charged or the particular circumstances leading up to its commission. But, as well said by Mr. Justice Campbell, the remedy for acquittals through maudlin sentiment or in response to popular clamor must be sought by correcting false notions, and not by destroying the safeguards of private liberty.

There are other objections to the act which would render it unconstitutional in individual cases. It provides what shall or may be done with persons who are insane, idiots, or imbeciles, at the time of their conviction, and the clear implication from this is that such unfortunates shall be placed on trial for their crimes. In that event, what becomes of the constitutional guarantees that the accused shall have the right to appear and defend in person, to be informed of the nature and cause of the accusation against him, to meet the witnesses, etc.? Of what possible avail are these guarantees to a man bereft of reason? But, without pursuing the inquiry further, I am of opinion that the act is unconstitu-

tional, in any aspect we may view it, and I therefore concur in the judgment of reversal.

GOSE and CHADWICK, JJ., concur with RUDKIN, C. J.

DUNBAR, J., concurs on the ground first discussed by RUDKIN, C. J.

MORRIS, J. (concurring)—I am not in accord with the views of my brethren as expressed in the foregoing opinions, in so far as it is sought to be shown that it is not within the power of the legislature to say that insanity shall not be a defense to crime. I can find no such inhibition in the constitution, either expressed or implied. No man, whether sane or insane, has any constitutional right to commit crime, and when the legislature provides that the criminality of an act shall be determined by the act itself, and not by the mental condition of the man who commits it, it violates none of the constitutional rights of the man accused of crime.

In so far as insanity has ever been permitted to determine the noncriminality of an act otherwise criminal, it has been by virtue of the law as given under legislative, and not constitutional, authority. The power to create is the power to destroy, and the same law-enacting body which has said that the insane man cannot be guilty of the commission of a crime may destroy that immunity and determine the character of his act by the same rules as determine the act of the sane man. It is not our purpose to discuss the subject other than in its constitutional aspect. Otherwise we might add—and why not—the defense of insanity is permitted, not because of the inability of the insane man to do the thing complained of, but because of his mental condition there is no moral responsibility, and hence there should be no legal responsibility. It is not the duty of the state to inquire into the moral guilt or innocence of those whom it adjudges guilty of crime, as it derives its power to determine guilt or innocence only as it finds its law violated and its commandments broken by the individual for whose act there is in law

no justification.   No defense has been so much abused, and
no feature of the administration of our criminal law has
so shocked the law-loving and the law-abiding citizen, as
that of insanity, put forward not only as a shield to the
poor unfortunate bereft of mind or reason, but more fre-
quently as a cloak to hide the guilty for whose act astute
and clever counsel can find neither excuse, justification, nor
mitigating circumstances, either in law or in fact.   It is,
therefore, not strange that there should be found a legis-
lative body seeking to destroy this evil and wipe out this
scandal upon the administration of justice.   While an inno-
vation to us, such a law is neither unknown nor untried, as
it has been the law of England since 1883; and while its
constitutionality cannot be questioned, it being an act of
Parliament and not subject to such attack, its enforcement
must have proved its value and obtained the approval of the
English people, or some way would have been found to bring
about its repeal.   I therefore am of the opinion that the
legislature has every right to pass a law which destroys this
much-abused defense.

I cannot, however, vote to sustain the law for the reasons
given by Rudkin, C. J., in the discussion of the second ob-
jection raised.   Insanity is a question of fact, and such a
fact as can only be determined as other material facts are
determined, and not left to the arbitrary announcement of
a court unaided by the only means known to our law for the
ascertainment of facts in a judicial procedure.   The ques-
tion of insanity should, therefore, be determined by the jury
as any other fact; and if in their judgment the person ac-
cused committed the act, but was insane at the time of its
commission, they should, in my opinion, have legislative au-
thority to so determine.   Such a fact, then, having been
judicially determined, with the preservation of all the con-
stitutional rights of the accused, authority should be given
the court to pronounce such judgment as the legislature in
its wisdom may determine.   Such is the English law above

referred to, and such a law would not be subject to the defects shown in the opinion of the chief justice.

For these reasons I concur in the result.

FULLERTON, J. (dissenting)—I am of the opinion that the law is constitutional and that it should be given effect by the courts.