FREDERICK FINGER, Appellant, *v.* THE
STATE OF NEVADA, Respondent.

No. 32716

July 24, 2001                                    27 P.3d 66

*Morgan D. Harris,* Public Defender, and *Howard S. Brooks,*
Deputy Public Defender, Clark County, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Stewart
L. Bell,* District Attorney, *James Tufteland,* Chief Deputy District
Attorney, and *Gregory D. Knapp,* Deputy District Attorney, Clark
County, for Respondent.

## OPINION

By the Court, BECKER, J.:

In April of 1996, appellant Frederick Finger was charged with one count of open murder with the use of a deadly weapon. Finger was accused of murdering his mother, Franziska Brassaw, by stabbing her in the head with a kitchen knife. Finger intended to assert legal insanity as a defense. However, at the time of his arraignment, the district court denied Finger's request to enter a plea of "not guilty by reason of insanity" as that plea had been abolished by the 1995 Nevada Legislature. Subsequently, Finger entered a plea of guilty but mentally ill to a charge of second-degree murder. The district court convicted Finger of second-degree murder and sentenced him to serve life in prison with minimum parole eligibility after ten years.

Finger challenges his conviction on constitutional grounds, alleging that the abolishment of insanity as an affirmative defense violates the 8th and 14th Amendments to the United States Constitution and Article 1, Sections 6 and 8(5), of the Nevada Constitution. Finger asserts that punishing an insane individual constitutes cruel and unusual punishment while prohibiting an accused from asserting a defense of legal insanity violates due process requirements.

While we conclude that neither the United States nor the Nevada Constitutions require that legal insanity be procedurally raised as an affirmative defense or by way of a plea of "not guilty

by reason of insanity," both Constitutions prohibit an individual from being convicted of a criminal offense without possessing the requisite criminal intent to commit the crime. For the reasons discussed herein, we conclude that Nevada's current statutory scheme would permit an individual to be convicted of a criminal offense under circumstances where the individual lacked the mental capacity to form the applicable intent to commit the crime, a necessary element of the offense. Such a statutory scheme violates the due process clauses of the United States and Nevada Constitutions. In light of our conclusion that Nevada's scheme does not comport with due process, we need not address Finger's arguments regarding the prohibition against cruel and unusual punishment. Because Finger was prohibited from raising the issue of legal insanity, we remand this matter to the district court with instructions to permit Finger to withdraw his plea of "guilty, but mentally ill," vacate the judgment of conviction and for further proceedings consistent with this opinion.

## FACTS

On April 10, 1996, at approximately 4:00 a.m., Jeff Jordan, a neighbor of Finger, woke to the sound of a woman screaming. A short time later, Finger pounded on Jordan's door while shouting "someone killed my mother! She's hurt real bad! I think she might be dead!" Jordan called 911 then got dressed and opened his door. Finger was not in sight. When the police arrived, Jordan noticed that Finger was now standing some distance down the block. Jordan pointed Finger out to the police. Police officers approached Finger who turned and ran away. The officers pursued and detained Finger. As the officers caught up with Finger, they noticed he was covered in blood. Prior to being detained, Finger announced that "someone beat my mother and killed her" and "the Mexican guy who lives in her house killed her." Because of the large amount of blood found on Finger as well as information received from Jordan, the officers wished to verify the safety of Brassaw or any other occupants inside Finger's residence. Jose Rivera, who shared occupancy of the residence with Finger and Brassaw, granted permission for the officers to enter the house. Upon entering the residence, police discovered Brassaw lying dead on the kitchen floor. Brassaw had been stabbed one time in the head with a kitchen knife, and had bled to death from the wound.

Officers interviewed another neighbor, Lawrence Collins, who related to the officers that he was awakened by talking outside his window. When he looked out the window, he observed Finger mumbling to himself. Collins told the police that he thought Finger said "I framed my mother" and that Finger was holding an object in his hand. Collins also led police to a bloodied kitchen

knife that Collins found in his yard not far from the place where Finger had been standing.

Rivera was also interviewed. He told the police that he was sleeping when he was awakened by the sound of a fight. He opened the door to his room and saw Brassaw staggering as if injured. Rivera then barricaded himself in his room until the noises stopped. Rivera had no blood on his clothes.

Finger gave a voluntary statement to the police. In it he claimed that he heard his mother screaming and that Rivera was stabbing her. He tried to stop Rivera and that's how he ended up with the bloodied kitchen knife and the blood on his clothes. Based upon the witness statements, the lack of blood on Rivera's clothes, the amount of blood on Finger's clothes and his statement to detectives, Finger was arrested for the murder.

Finger has an extensive history of mental illness. He was first determined to be mentally ill in 1972 at the age of seventeen. Finger has been diagnosed as suffering from schizophrenia, manic depressive disorder with homicidal and suicidal tendencies, intermittent explosive disorder and paranoia. Finger periodically suffers from visual and auditory hallucinations. In addition, Finger had a long history of violence and co-dependency with his mother and had been institutionalized in mental heath facilities several times due to delusions and attacks on his mother or other members of his family.

Upon interviewing Finger, it was immediately apparent to defense counsel that Finger was of questionable mental capacity. Counsel sought psychiatric evaluations. Two of the three evaluations concluded that Finger was unable to aid in his own defense. Based upon the evaluations, the district court committed Finger to the Lakes Crossing Center for the Criminally Insane until such time as he was found competent to participate in judicial proceedings.

In the course of these evaluations, Finger gave two different versions of what happened to his mother. The first version was consistent with his statements to the police. Finger claimed that Rivera had killed his mother, but could not give a coherent explanation for the blood on his clothes or his possession of the knife. The second version was an admission that he had stabbed his mother because she had been plotting to kill him and he decided to kill her before she had the opportunity to carry out her plot.

On December 18, 1996, Finger was deemed competent and Finger's case was remanded for a preliminary hearing. The hearing was conducted and Finger was bound over for trial. In the district court, Finger filed a motion seeking leave to enter a plea of not guilty by reason of insanity. Finger's counsel filed the motion because the 1995 Nevada Legislature had amended the laws concerning the treatment of insanity as a defense to criminal culpa-

bility. Counsel believed, based upon the legislative history of the amendments, that he would be prohibited from arguing that Finger should be acquitted of the murder charges on the grounds of legal insanity.

The motion was never argued and no order disposing of the motion was ever entered by the district court. Instead, the record reflects that at the time of his arraignment, Finger requested permission from the district court to enter a plea of not guilty by reason of insanity. The State objected and the district court denied the request without explanation. There is no indication in the record that the district court considered the legal issues raised in the written motion.

After the district court denied his request, Finger declined to enter a plea. The district court then entered a plea of not guilty pursuant to NRS 174.035(5) and set a trial date. Based upon the district court's denial of his request to plead not guilty by reason of insanity and, by inference, his ability to raise insanity as a complete defense to the murder charge, Finger determined that there were no issues to be resolved by a trial. Therefore, Finger entered his plea of guilty but mentally ill, deciding to raise the constitutional issues relating to legal insanity through an appeal pursuant to NRS 174.035(3). Based upon his plea, Finger was convicted of second-degree murder. This appeal followed.

## DISCUSSION

Finger contends that the ability of an accused to pursue a defense of legal insanity is a fundamental right under the due process clauses of the United States and Nevada Constitutions.[1] He asserts that various amendments to the provisions of the criminal procedure statutes in Senate Bill 314 (hereinafter S.B. 314) enacted by the 1995 Legislature changed the substantive and procedural law regarding how the issue of legal insanity is treated in a criminal case and that these changes have resulted in an unconstitutional statutory scheme.

In 1995 the Legislature abolished the plea of "not guilty by reason of insanity" and created a new plea of "guilty but men-

[1] Finger asserts two additional grounds for relief. Finger contends that Nevada's statutory treatment scheme improperly discriminates between individuals who enter a plea of guilty but mentally ill and individuals with mental illnesses who are convicted after a jury trial in violation of the Equal Protection Clause of the Federal and State Constitutions. Further, Finger alleges that the statutory scheme creates an improper chilling effect upon a defendant's right to a jury trial, because a mentally ill defendant will be forced to plead guilty if he or she wishes to avail themselves of appropriate treatment options in prison. In light of our decision declaring the 1995 statutory scheme to be unconstitutional on other grounds, we decline to address these issues.

tally ill.'' In addition, the Legislature amended the statutes that define what types of individuals can be punished for the violation of a criminal law. Finally, the Legislature enacted language declaring that an act committed by a person while in a state of insanity is no less criminal by reason of insanity and repealing the statute authorizing commitment of the criminally insane. At the same time, however, by enacting S.B. 314, the Legislature permitted insanity to be taken into consideration whenever purpose, motive or intent is a necessary element of a criminal offense. *See* 1985 Nev. Stat., ch. 637, at 2448-85 (amending NRS 174.035, 193.220 and 194.010 and repealing 175.521).

Under the post-1995 statutory scheme, an individual pleading ''guilty but mentally ill'' is still subject to the same punishment as an individual who enters an unconditional plea of guilty or is found guilty upon trial. In the case of guilty but mentally ill defendants, however, the district court may suggest that the prison system provide certain types of treatment to the convicted individual. The status of an ''insane'' individual, however, is unclear. The Legislature deleted the term ''insanity'' from a number of statutes that define criminal culpability and criminal defenses. Insanity as it relates to liability for a criminal offense is now found only in NRS 193.220, which provides that:

> No act committed by a person while in a state of insanity or voluntary intoxication shall be deemed less criminal by reason of his condition, but whenever the actual existence of any particular purpose, motive or intent is a necessary element to constitute a particular species or degree of crime, the fact of his insanity or intoxication may be taken into consideration in determining the purpose, motive or intent.

Finger argues that language of NRS 193.220, together with the elimination of insanity as an affirmative defense, permits persons to be convicted of crimes even though they did not possess the mental ability to form the criminal intent designated as an element of an offense. Finger contends that such a conviction violates the Due Process Clauses of the Federal and State Constitutions.

On its face, NRS 193.220 is a contradiction in terms. It states that a person who is insane cannot be relieved of criminal culpability, *i.e.,* acquitted, as a result of that insanity. Yet it also recognizes that insanity can be considered when determining whether or not an element of the crime has been proven beyond a reasonable doubt. Normally, when faced with such a statute, a court will construe the statute in favor of the accused. ''[P]enal statutes should be strictly construed and resolved in favor of the defendant when the applicability of such statute is uncertain.'' *Anderson v.*

*State,* 95 Nev. 625, 629, 600 P.2d 241, 243 (1979). Thus we could construe NRS 193.220 to simply be a change in the procedure by which the issue of legal insanity is presented to the jury, rather than a change in the substantive law of insanity. In part, this is the dissent's position. However, because NRS 193.220 was not the only statute affected by the 1995 legislative enactment, we conclude a review of the legislative history behind S.B. 314 is necessary to understand the relationship of NRS 193.220 to the law of legal insanity and Finger's expectation of how a trial would be conducted under the new statutory scheme. When considering the history of S.B. 314, it is also necessary to review the historical development of the insanity defense and its application in Nevada prior to the 1995 legislative amendments.

## I.  *Historical perspective*

For hundreds of years, societies recognized that insane individuals are incapable of understanding when their conduct violates a legal or moral standard, and they were therefore relieved of criminal liability for their actions. Such individuals did not escape responsibility for their actions; they were still locked away, but in asylums, not prisons.

This concept of treating individuals differently based upon their mental capacity is called legal insanity. It recognizes that a "crime" involves something more than just the commission of a particular act, it also involves a certain mental component. This mental component is usually referred to as the *mens rea* of a crime, or criminal intent. The term *"mens rea"* refers to the mental state of a person at the time of the commission of the criminal act. Most serious crimes, either at common law or by statute, require a particular degree of *mens rea,* or criminal intent, to be proven as a material element of the offense. This is usually demonstrated by the use of such words as "knowingly," "willfully," or "deliberately." *See generally* American Law Institute Model Penal Code § 2.02 (1985). Where a person is unable to form the required criminal intent, the *mens rea,* that person is considered to be legally insane.

The American Bar Association has researched and documented centuries of references to this idea.

> As early as the sixth century B.C., commentary on the Hebrew scriptures distinguished between harmful acts traceable to fault and those that occur without fault. To those ancient scholars, the paradigm of the latter type of act was one committed by a child, who was seen as incapable of weighing the moral implications of personal behavior, even when willful; retarded and insane persons were likened to children. *See* Platt & Diamond, *The Origins and*

*Development of the "Wild Beast" Concept of Mental Illness and Its Relation to Theories of Criminal Responsibility.* 1 J. Hist. Behav. Sci. 355, 366 (1965).

ABA Criminal Justice Mental Health Standards 324 (1989).

Although the general concept of legal insanity in relation to criminal culpability is centuries old, the definition of what constitutes legal insanity and how it should be presented to a jury under the American legal system is not so ancient. It first became a topic of intense legal discussion as a result of a singular instance in English history. In 1843, Daniel M'Naghten attempted to assassinate the prime minister of Britain. M'Naghten suffered from a paranoid delusion. He believed that the prime minister was conspiring to kill him. As a result of this delusional belief, M'Naghten determined that he would kill the prime minister before the prime minister could act against M'Naghten. M'Naghten shot at the prime minister's carriage, killing the prime minister's secretary, a passenger in the carriage. M'Naghten was acquitted of the crime based upon the definition of insanity which was given to the jury in the judge's instructions.

The acquittal was met with public outrage. Queen Victoria and the House of Lords summoned the judges of the common-law courts to answer questions regarding the concept of insanity and its relationship to moral and criminal culpability. Fourteen of the fifteen justices agreed that the instructions given to the jury were improper and that M'Naghten should not have been acquitted. The judges then endorsed the following definition of legal insanity, which has become known as the M'Naghten rule.

> [T]he jurors ought to be told in all cases that every man is to be presumed to be sane, and to possess a sufficient degree of reason to be responsible for his crimes, until the contrary be proved to their satisfaction; and that to establish a defence on the ground of insanity, it must be clearly proved that, at the time of the committing of the act, the party accused was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong.

*M'Naghten's Case,* 8 Eng. Rep. 718, 10 Cl. & Fin. 200, 209 (1843). *M'Naghten* created a very strict guideline for determining insanity. The fact that a person had mental health problems did not necessarily mean that he or she could meet the M'Naghten test for insanity.

In order to be considered legally insane under *M'Naghten,* a defendant must labor under a delusion so great that he is incapable of appreciating his surroundings. This delusion must do one

of two things: (1) rob the defendant of the ability to understand what he is doing; or (2) deprive the defendant of the ability to appreciate that his action is wrong, that is, not authorized by law. For example, persons who think that they are shooting at a target shaped like a human being would meet the first factor of the standard. They would not understand the nature and quality of their act (*i.e.,* shooting at a person, not a target). Similarly, persons who thought they were soldiers in the middle of a battlefield and that the individuals they were killing were enemy forces would meet the second factor of *M'Naghten.* Such persons would know they were shooting and killing human beings, but would not understand that it was wrong because of their delusional belief they were in the middle of a war.

Addressing the House of Lords, Lord Chief Justice Tindal described the relationship of delusional states to legal insanity:

> The fourth question which your Lordships have proposed to us is this: "If a person, under an insane delusion as to existing facts, commits an offense in consequence thereof, is he thereby excused?" To which question the answer must, of course, depend on the nature of the delusion: but, making the same assumption as we did before, namely, that he labours under such partial delusion only, and is not in other respects insane, we think he must be considered in the same situation as to responsibility as if the facts with respect to which the delusion exists were real. For example, if, under the influence of his delusion, he supposes another man to be in the act of attempting to take away his life, and he kills that man, as he supposes, in self-defence, he would be exempt from punishment. If his delusion was that the deceased had inflicted a serious injury to his character and fortune, and he killed him in revenge for such supposed injury, he would be liable to punishment.

*M'Naghten's Case,* 8 Eng. Rep. 718, 10 Cl. & Fin. 200, 211 (1843). Using this standard, the English common-law judges then concluded that M'Naghten was not legally insane because, even if his delusion were true and the prime minister was conspiring to kill M'Naghten, this would not entitle M'Naghten to take the law into his own hands and hunt down the prime minister.

While such severe delusional states do exist, they are not the kind of mental illness most commonly encountered in the criminal justice system. In the past one hundred and fifty years, few defendants with mental health problems have been acquitted based upon the legal insanity test set forth in *M'Naghten.* Cynthia G. Hawkins-León, *"Literature as Law": The History of the Insanity Plea and a Fictional Application Within the Law & Literature Canon,* 72 Temp. L. Rev. 381, 409 (1999).

Beginning in the early 1900s, some legal scholars and mental health professionals began to advocate for an expanded definition of legal insanity. They felt the M'Naghten rule was too limited and that people with severe mental illnesses were being improperly convicted of crimes. The M'Naghten rule looks only to the cognitive condition of the defendant's state of mind. That is, the ability of the defendant to perceive reality and make rational choices based upon that perception. If you can form the criminal intent to do an act, then the reasons why you think you must do the act are irrelevant. Advocates for change believed that individuals who suffered from partial delusions, such as a conspiracy complex, should not be subject to criminal incarceration, but should be committed to a treatment facility for the mentally ill. Although such individuals had the mental capacity to form the required *mens rea* or criminal intent, advocates argued that these individuals could not control their acts and that to handle such individuals through the criminal justice system was inhumane. This is referred to as the "volitional" component of legal insanity. Henry T. Miller, *Recent Changes in Criminal Law: The Federal Insanity Defense,* 46 La. L. Rev. 337, 343-47 (1985).

This advocacy resulted in some courts adopting a new standard for legal insanity, the irresistible impulse test. Under this theory, a defendant is legally insane if he suffers from a mental condition that creates overwhelming compulsions urging him to commit the illegal acts. *See Smith v. United States,* 36 F.2d 548 (D.C. Cir. 1929). For example, if a person was under a delusion that God wanted certain people killed and, based upon hearing the voice of God, that individual immediately began killing people around him, then that person would be legally insane under the irresistible impulse test, but not under the M'Naghten standard. The individual knew that he was killing human beings and that he was not authorized by law to take a human life, but he could not resist what he perceived to be the will of God and acted under the impulse of his delusion. Hawkins-León, *supra,* at 393-95.

Discussions and debates over the definition of legal insanity continued into the 1950s. Additional tests were proposed or adopted. In *Durham v. United States,* 214 F.2d 862 (D.C. Cir. 1954), the Circuit Court of Appeals for the District of Columbia held that a person is not responsible for actions that are the product of a mental disease or defect. Under the Durham standard, individuals were legally insane if they would not have committed the criminal act but for the existence of a mental disease or defect. In other words, if I did not have a delusion, I would not have committed the criminal act.

However, *Durham* was criticized as being too expansive. Another proposal, developed by the American Law Institute (ALI), combined elements of the M'Naghten rule, the irresistible

impulse test and Durham. Under this theory, a person is not responsible for criminal conduct committed during a time when, as a result of a severe mental disease or defect, that person lacks substantial capacity either to appreciate the criminality of his or her conduct or to conform his or her conduct to the requirements of law. American Law Institute Model Penal Code § 4.01 (1985). The ALI Model Penal Code, however, excluded conditions that manifested only through repeated criminal or anti-social conduct, in other words, you are not legally insane simply because you commit violent acts. To be considered legally insane under the ALI Model Penal Code, a person does not have to be totally incapacitated, as with the M'Naghten rule, but they must have a substantial impairment of their mental capacity as opposed to simply having some impairment as under Durham. Hawkins-León, *supra,* at 397-99.

In addition to discussing what test to use in determining legal insanity, courts and scholars have also debated over the procedural method for asserting the issue. Under *M'Naghten,* insanity is considered an affirmative defense which must be proven by the defendant. The burden of proof can be either: (1) by a preponderance of the evidence, (2) by clear and convincing evidence or (3) beyond a reasonable doubt. *See Leland v. Oregon,* 343 U.S. 790 (1952). In contrast, other jurisdictions have determined that insanity is not an affirmative defense, but an issue of presumptions. A person is presumed to be sane. This presumption can be rebutted by the introduction of evidence tending to show that the defendant is legally insane. Once such evidence is presented, the prosecution has the burden of proving the defendant's sanity beyond a reasonable doubt. *See Davis v. United States,* 160 U.S. 469 (1895).

Combining definitions of legal insanity with the procedural mechanism for asserting the subject leads to a range of methods for dealing with the issue. The most restrictive method is the M'Naghten definition of legal insanity combined with a defendant having to prove legal insanity beyond a reasonable doubt as an affirmative defense. The least restrictive would be the use of the Durham test of legal insanity combined with the requirement that the prosecution must prove sanity beyond a reasonable doubt once a defendant introduces evidence rebutting the presumption of sanity.

The trend to expand the definition of legal insanity continued into the early 1980s. It ceased, however, as a result of John Hinckley's acquittal in the attempted assassination and shooting of President Ronald Reagan. Hinckley asserted the insanity defense, alleging he was under an irresistible compulsion brought on by a mental disease or defect. Hinckley would not have been able to assert his defense under the M'Naghten rule, but was successful in convincing a jury that he was legally insane under the lesser

standards embodied by *Durham* that governed his trial.[2] *United States v. Hinckley,* 672 F.2d 115 (D.C. Cir. 1982).

In response to the *Hinckley* case, many jurisdictions made changes to their laws regarding the concept of legal insanity. Some adopted a compromise approach between M'Naghten and the irresistible impulse or Durham tests. Others changed the burden and standards of proof relating to the insanity defense. Some did both. *See, e.g.,* The Insanity Defense Reform Act of 1984, 18 U.S.C. § 17 (1988); Hawkins-León, *supra,* at 402-03.

In addition to the above changes, two new approaches to dealing with mentally ill defendants were considered. The first of these new theories incorporates the idea that a person can be found guilty, but mentally ill, of a criminal offense. It was originally intended as an additional verdict or plea, not as a replacement for the insanity defense. It gives the criminal justice system an alternative to either finding mentally ill persons guilty of a criminal offense or totally acquitting them of any criminal liability.

This allows states to maintain a stricter definition of insanity, but still provide for a verdict with different penalty implications for persons with mental health conditions that did not rise to the level of legal insanity. It has sometimes been described as a codification of the rule of diminished capacity. In such a case, the state mandates different treatment for such individuals than would be accorded to them under a more traditional finding of guilt. Thus a jury would be less inclined, out of sympathy for the defendant's mental condition, to improperly acquit a defendant because they would have another option. *See* Christopher Slobogin, *The Guilty But Mentally Ill Verdict: An Idea Whose Time Should Not Have Come,* 53 Geo. Wash. L. Rev. 494 (1985); Ira Mickenberg, *A Pleasant Surprise: The Guilty But Mentally Ill Verdict Has Both Succeeded in Its Own Right and Successfully Preserved the Traditional Role of the Insanity Defense,* 55 U. Cin. L. Rev. 943 (1987).

The second theory to be developed after *Hinckley* involved abolishing legal insanity as a defense. Insanity is only admissible as it relates to a material element of a criminal offense, such as intent. Only where the level of mental illness completely negates a necessary element would a defendant be entitled to an acquittal. In addition, the definition of legal insanity under this theory is narrowed to include only the first part of the M'Naghten rule. Under this new theory, *mens rea,* or criminal intent, is viewed

---

[2]Hinckley was obsessed with actress Jodi Foster and presidential assassins. He attempted to kill President Reagan in an effort to gain her attention and secure a place in history. While his thought process was clearly irrational, Hinckley knew that he was shooting at a human being and that such an action was illegal, indeed Hinckley intended to commit murder.

more in the context of strict liability, that is, so long as you had the intent to commit a particular act, you would be held liable for that act even though the definition of the crime might require a more specific mental state, such as an element of malice. Professor Joshua Dressler best described the difference by using the following example:

> [I]f D is prosecuted for intentionally killing V, D may introduce evidence that, due to mental illness, she believed she was squeezing a lemon rather than strangling V and, therefore, that she lacked the intent to kill. Evidence of D's mental condition would be inadmissible, however, to show that she did not realize that taking a life is morally or legally wrong, that she acted on the basis of an irresistible impulse to kill, or even that she killed V because she hallucinated that V was trying to kill her.

Joshua Dressler, *Understanding Criminal Law* § 25.07(C)(1), at 330 (2d ed. 1995).

This approach has been designated by legal scholars as the *mens rea* model because it defines *mens rea,* or criminal intent, only in terms of the decision to do a certain act and eliminates the concept of the appreciation of the wrongfulness of the act. As long as a defendant can appreciate the nature and quality of his act, he is not legally insane and is capable of forming the necessary *mens rea.* Therefore, the person who thought he was shooting at a target would still be legally insane, but the individual who believes he is killing an enemy soldier would not qualify as insane under the law. Under this approach, because the latter individual is capable of recognizing he was killing a human being, he possesses the requisite intent to kill.

The *mens rea* model alters the focus of criminal intent, without actually changing the elements of the crimes themselves. It assumes that all crimes require the simple intent to do an act and it ignores the fact that most crimes have a required element of knowledge, willfulness or something beyond the mere performance of an act. It treats all criminal intent more like an aspect of strict liability. Idaho, Montana and Utah have adopted some form of the *mens rea* approach. *See* Catherine E. Lilly, Recent Developments (pt. G.), *State v. Herrera: The Utah Supreme Court Rules in Favor of Utah's Controversial Insanity Defense Statute,* 22 J. Contemp. L. 221 (1996); Brian E. Elkins, *Idaho's Repeal of the Insanity Defense: What Are We Trying to Prove?,* 31 Idaho L. Rev. 151 (1994); *Due Process—Insanity Defense—Idaho Supreme Court Upholds Abolition of Insanity Defense Against State and Federal Constitutional Challenges,* 104 Harv. L. Rev. 1132 (1991).

As can be seen from the above discussion, federal and state

laws regarding the insanity defense cover a broad spectrum of theories with respect to the treatment accorded to a mentally ill defendant. They are the product of society's continuing struggle over the need to protect the public from the actions of such individuals versus our recognition that a severally mentally ill individual may not possess the same level of culpability as a person who has no mental health problems.

## II. *Nevada law and the 1995 amendments*

Prior to the 1995 Legislative Session, Nevada's statutes codified the rule that a person cannot be convicted of a criminal offense if they lack the capacity to appreciate the wrongfulness of their act. NRS 194.010 provided, in part, that:

> All persons are liable to punishment except those belonging to the following classes:
> 1. Children under the age of 8 years.
> 2. Children between the ages of 8 years and 14 years, in the absence of clear proof that at the time of committing the act charged against them they knew its wrongfulness.
> 3. Idiots.
> 4. Lunatics and persons who committed the act or made the omission charged in a state of insanity.

The statutory language discusses the same classes of people as the ancient scholars referenced by the American Bar Association Standards and Platt & Diamond: children, retarded or insane individuals.[3]

In determining what constitutes legal insanity, Nevada courts applied the M'Naghten rule. *See Williams v. State,* 85 Nev. 169, 451 P.2d 848 (1969), *cert. denied,* 396 U.S. 916 (1969); *Kuk v. State,* 80 Nev. 291, 392 P.2d 630 (1964); *Sollars v. State,* 73 Nev. 248, 316 P.2d 917 (1957); *State v. Lewis,* 20 Nev. 333, 22 P. 241 (1889). In addition, Nevada procedurally considered insanity to be an affirmative defense. NRS 174.035(4) provided that:

> 4. The defendant may, in the alternative or in addition to any one of the pleas permitted by subsection 1, plead not guilty by reason of insanity. A defendant who has not so pleaded may offer the defense of insanity during trial upon good cause shown. Under such a plea or defense, the burden of proof is upon the defendant to establish his insanity by a preponderance of the evidence.

---

[3]The terms "idiot" or "retarded," while unfortunate, are not intended to be pejorative in nature. They encompass those individuals who possess defects existing from birth that prohibit individuals from developing the mental maturity necessary to know right from wrong regardless of their chronological age. *Singleton v. State,* 90 Nev. 216, 522 P.2d 1221 (1974).

*See also Gallegos v. State,* 84 Nev. 608, 446 P.2d 656 (1968) (the defendant must establish his insanity by a preponderance of the evidence).

Moreover, in adopting the M'Naghten standard, we also adopted the M'Naghten guideline for evaluating delusional states as they relate to the concept of legal insanity.

> In Browne's Medical Jurisprudence of Insanity the author approves the decision in *McNaghten's* [sic] *Case,* and, in the course of the discussion, says: "The rule that the nature of the delusion is always to be considered in relation to the nature of the act; that when the facts which are falsely believed are such as would, if they had really existed, have justified the act, the act shall be justified, and when they are such as, even supposing they were true, would not have justified the act of which the prisoner is accused, then his act is criminal."

*Lewis,* 20 Nev. at 362, 22 P. at 252.

Finally, in rare instances where individuals were found to be not guilty by reason of insanity, they were immediately committed to a mental health facility. They would only be released if a judge determined that they were no longer mentally ill and that they were not a danger to themselves or others. *See* former NRS 175.521 (1994).

Thus, prior to the 1995 amendments, Nevada took a very strict approach to the issue of legal insanity. Nevada was not one of the states that reacted to the Hinckley decision and instituted new procedures or laws regarding legal insanity. Such actions were not necessary since Nevada already adhered to a very narrow view of legal insanity.

In 1995, at the urging of the Nevada District Attorney's Association, the Nevada Legislature considered several amendments to the laws involving the insanity defense. These amendments were proposed to resolve perceived problems with Nevada's statutory or case law that had developed subsequent to *Hinckley*. Hearing on S.B. 314 Before the Senate Committee on Judiciary, 67th Leg. (Nev., April 4, 1995).

The prosecutors believed that too many courts were allowing defendants to present evidence of mental health problems and argue for an insanity acquittal even when that evidence did not relate to, or support, a M'Naghten defense. Instead such evidence appeared to be more aligned with concepts of the irresistible impulse, Durham or ALI Model Penal Code tests, theories of legal insanity which were not recognized under Nevada law. This was particularly true when lay and expert witnesses were allowed to give opinions regarding the defendant's sanity without understanding the legal standard for determining insanity under

*M'Naghten.* Hearing on S.B. 314 Before the Senate Committee on Judiciary, 67th Leg. (Nev., April 4, 1995); *see also Criswell v. State,* 84 Nev. 459, 443 P.2d 552 (1968) (a father testified about his son's generally peculiar behavior and then indicated his belief that his son was "insane"); *Clark v. State,* 95 Nev. 24, 588 P.2d 1027 (1979) (doctors testified that the defendant suffered from severe postpartum depression and was therefore incapable of realizing that abandoning her two-week-old baby in the desert was wrong).

Finally, juries and expert witnesses were only given the basic M'Naghten instruction about whether a defendant was capable of knowing or understanding the nature and quality of their acts or incapable of knowing or understanding that the act was wrong. The delusional analysis regarding knowing right from wrong was not presented to the witnesses or jurors.

Prosecutors also testified that courts were reluctant to exclude consideration of legal insanity because of the general principle that a defendant is entitled to present evidence and request jury instructions encompassing his or her theory of the case. *See Aldana v. State,* 102 Nev. 245, 720 P.2d 1217 (1986) (witnesses testified that defendant was acting abnormally on the days before he shot his wife, he was "crazy" and he believed his wife was trying to poison him).

The Association did not give specific case names in its testimony, but it did relate anecdotal stories targeting the facts of the cases cited in the preceding paragraphs. To add to the confusion, representatives of the defense bar also gave definitions of legal insanity which did not use the M'Naghten standard. On the face of the information contained in these case opinions in the testimony, it is questionable that any of the defendants referred to in those examples would meet the M'Naghten standard as discussed in *Lewis.* Thus, given the cases and testimony, the Legislature could not ascertain an accurate picture of what constituted legal insanity under Nevada law. Specifically, the Legislature could not determine whether the court had intended to expand M'Naghten informally without adopting some new test for legal insanity or if the court had simply improperly analyzed those cases by not considering the relationship of delusions to wrongfulness and criminal intent as required by *Lewis.*

While the Association acknowledged that no one had been acquitted improperly, the admission of such evidence, and the need for the prosecution to hire its own experts to rebut such evidence, was a costly and time-consuming process. To correct this situation, the Association proposed the adoption of a legislative scheme based on the Idaho, Montana and Utah statutes that embraced the *mens rea* model. Insanity would no longer be treated as an affirmative defense, legal insanity would be abol-

ished and a new plea, "guilty but mentally ill," would be created.[4] Hearing on S.B. 314 Before the Senate Committee on Judiciary, 67th Leg. (Nev., April 4, 1995).

Under the new system, a defendant who entered a plea of guilty but mentally ill would still be convicted of a criminal offense. Prior to sentencing, the judge would then determine whether or not the defendant was suffering from a mental illness and, if so, what type of treatment regime should be suggested to the division of parole and probation or the prison for supervising the defendant's sentence.

Given the confusion in our case law and the testimony presented at the hearings, the Legislature determined to abolish the concept of legal insanity as a defense to culpability and enacted laws following the *mens rea* model. As a result of the 1995 amendments, NRS 174.035 now reads, in part, as follows:

> 1. A defendant may plead not guilty, guilty, guilty but mentally ill or, with the consent of the court, nolo contendere. The court may refuse to accept a plea of guilty or guilty but mentally ill.
>
> . . . .
>
> 4. A plea of guilty but mentally ill is not a defense to the alleged offense. A defendant who enters such a plea is subject to the same penalties as a defendant who pleads guilty.

In addition to amending NRS 174.035, the Legislature also amended NRS 194.010 to delete the provisions dealing with lunatics or insanity and repealed NRS 175.521, the criminal commitment statute. Finally, the Legislature amended NRS 193.220 to codify the *mens rea* model. As noted above, NRS 193.220 now states that:

> No act committed by a person while in a state of insanity or voluntary intoxication *shall be deemed less criminal by reason of his condition,* but whenever the actual existence of any particular purpose, motive or intent is a necessary element to constitute a particular species or degree of crime, *the fact of his insanity or intoxication may be taken into consideration in determining the purpose, motive or intent.*[5]

(Emphasis added.)

---

[4]The amendments only provide for a plea of guilty but mentally ill. There is no provision for a jury to render such a verdict. Moreover, the procedure adopted by the Legislature does not follow the rationale or policies usually associated with this concept as discussed by Professors Slobogin and Mickenberg. Unlike some of the other states that have adopted the guilty but mentally ill approach, Nevada has no separate facilities for the incarceration and treatment of defendants who are not legally insane but may suffer from mental illness.

[5]Previously this section only referred to voluntary intoxication. Several

The Legislature also enacted new sections of the Nevada Revised Statutes setting forth the procedures a court must follow when accepting a plea of guilty but mentally ill. NRS 174.041 and NRS 176.127 are two of the new statutes. NRS 174.041 provides that:

1. If a plea of guilty but mentally ill is entered by a defendant, the court shall hold a hearing within a reasonable time to determine whether the defendant was mentally ill at the time of the commission of the alleged offense to which the plea is entered.

2. The court may order the examination of the defendant or receive the testimony of any expert witness offered by the defendant or the prosecuting attorney, or both.

3. At the hearing, the court shall advise the defendant that a plea of guilty but mentally ill is a plea of guilty and not a defense to the alleged offense.

4. The court shall accept the plea of guilty but mentally ill only if it determines that the defendant was mentally ill at the time of the alleged offense to which the plea is entered.

NRS 176.127 provides that:

1. If a court accepts a plea of guilty but mentally ill pursuant to NRS 174.041, the court shall, before imposing sentence, afford the defendant an opportunity to present evidence of his present mental condition. If the defendant claims that he is mentally ill at the time of sentencing, the burden of proof is upon the defendant to establish that fact by a preponderance of the evidence.

2. If the defendant has been ordered to the custody of the department of prisons, the court may order the department to cause an examination of the defendant to be conducted to determine his mental condition, and may receive the evidence of any expert witness offered by the defendant or the prosecuting attorney.

3. If the court finds:

(a) That the defendant is not mentally ill at the time of sentencing, it shall impose any sentence that it is authorized to impose upon a defendant who pleads or is found guilty of the same offense.

(b) By a preponderance of the evidence that the defendant is mentally ill at the time of sentencing, it shall impose any sentence that it is authorized to impose upon a defendant

---

other provisions of the statutes were also amended to delete any reference to insanity or add language referencing a plea of guilty but mentally ill. The provisions of those statutes have no bearing upon our decision and are therefore not referenced in this opinion.

who pleads or is found guilty of the same offense and include in that sentence an order that the defendant, during the period of his confinement or probation, be given such treatment as is available for his mental illness if the court determines that the relative risks and benefits of the available treatment are such that a reasonable person would consent to such treatment. The treatment must be provided by the department of prisons.

In summary, under the current law, an accused cannot argue that he or she should be acquitted on the basis of legal insanity. He or she can only argue that the State has not proven intent beyond a reasonable doubt. If a jury does acquit a defendant because they are not convinced that the person had the mental capacity to form the intent to commit the crime, then that person is no longer immediately transferred to a mental health facility. Instead, a person could only be held under provisions of the civil involuntary commitment statutes. *See* NRS 433A.115 et. seq.

## III.  *Constitutional analysis*

Finger contends that NRS 193.220, if interpreted in accordance with the *mens rea* model as intended by the Legislature, is unconstitutional because it would permit an individual to be convicted of a criminal offense without being able to form the necessary criminal intent. Finger argues that due process requires that the concept of *mens rea,* at least with the most serious crimes, incorporates an element of wrongfulness; that is, a person not only intends to do the specific act, but also understands the act is wrong because it is not permitted by law. Finger also contends that due process requires that a defendant be able to present the issue of legal insanity by asserting legal insanity as an affirmative defense.

The State argues that while insanity is no longer a defense, the provisions of NRS 193.220 permit a defendant to introduce evidence regarding insanity as it relates to the ability of the defendant to form intent. If the Legislature requires the *mens rea* of a crime to include an element of wrongfulness, then both tests under *M'Naghten* apply. If the criminal statute does not specify such a requirement, then individuals would only be legally insane if they failed to know and understand the nature and quality of their acts or the first test of *M'Naghten.* An individual who lacks the required intent could not be convicted of a criminal offense. Thus NRS 193.220 is constitutional because there is no requirement that legal insanity be asserted by way of an affirmative defense, only that a person who is legally insane cannot be convicted of an offense.

The State, however, has referenced the statutory schemes and cases from Idaho, Montana and Utah in its arguments. In doing so, the State appears to be adopting the concept inherent in the *mens rea* model that knowledge that one's actions are "wrong" is not generally an element of a crime, even a specific intent crime, and it is not a requirement of murder. Moreover, the *mens rea* model, adopted by the Nevada Legislature, assumes that "wrongfulness" is never an element of intent, regardless of the crime. If this is so, then the State's argument that the 1995 legislative amendments only affect the method by which the issue of insanity is addressed must fail.

### A. *Due Process Clause*

The Due Process Clause mandates protection of those principles deemed "fundamental to the American scheme of justice." *Duncan v. Louisiana,* 391 U.S. 145, 149 (1968). The history of American jurisprudence reflects that it is a fundamental principle of our law that a defendant who is incapable of forming the requisite intent, or *mens rea,* to commit a crime cannot be convicted of a crime. One who does not possess the necessary criminal intent is not subject to criminal punishment.

> The contention that an injury can amount to a crime only when inflicted by intention [*i.e.,* culpable mental state] is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil. A relation between some mental element and punishment for a harmful act is almost as instinctive as the child's familiar exculpatory "But I didn't mean to," and has afforded the rational basis for a tardy and unfinished substitution of deterrence and reformation in place of retaliation and vengeance as the motivation for public prosecution.

*Morissette v. United States,* 342 U.S. 246, 250-51 (1952).

*Mens rea* is a fundamental aspect of criminal law. Thus it follows that the concept of legal insanity, that a person is not culpable for a criminal act because he or she cannot form the necessary *mens rea,* is also a fundamental principle. Indeed the term "legal insanity" simply means that a person has a complete defense to a criminal act based upon the person's inability to form the requisite criminal intent. Congress, even in the face of the public outrage following the Hinckley trial, refused to completely abolish the concept of legal insanity, recognizing that culpability is a pre-

requisite to a criminal prosecution. *See* H.R. Rep. No. 98-577 at 7-8 (1983). While courts and scholars may debate what standard or definition should apply in determining what constitutes legal insanity, or by what method it should be raised, all have agreed that due process requires that a defendant be able to present evidence and argue that he or she lacked the *mens rea* to commit the criminal act.

It is because legal insanity is a corollary of *mens rea,* the mental state that imposes criminal responsibility upon an individual, that legal insanity is a fundamental principle under the Due Process Clause. What constitutes a "fundamental principle" is largely a matter of historical development. "Our primary guide in determining whether the principle in question is fundamental is, of course, historical practice." *Montana v. Egelhoff,* 518 U.S. 37, 43 (1996). Historical practice overwhelmingly supports the conclusion that legal insanity is a fundamental principle. As Justice Stewart notes in his dissenting opinion in *State v. Herrera,* 895 P.2d 359, 372 (Utah 1995):

> [R]ecognition of insanity as a defense is a core principle that has been recognized for centuries by every civilized system of law in one form or another. Historically, the defense has been formulated differently, but given the extent of knowledge concerning principles of human nature at any given point in time, the essence of the defense, however formulated, has been that a defendant must have the mental capacity to know the nature of his act and that it was wrong.

Legal insanity has been an established concept in English common law for centuries. *See* Anthony Platt and Bernard L. Diamond, *The Origins of the "Right and Wrong" Test of Criminal Responsibility and Its Subsequent Development in the United States: An Historical Survey,* 54 Calif. L. Rev. 1227, 1229-30 (1966). Since the reign of Edward II (1307-1321), English law acknowledged that an individual who does not know what he is doing or that what he is doing is wrong cannot be held criminally liable. *State v. Searcy,* 798 P.2d 914, 928 (Idaho 1990) (quoting from Biggs, *The Guilty Mind,* 83 (1955)). In his dissent in *Searcy,* Justice McDevitt outlines the extensive history of the insanity defense at common law. *Searcy,* 798 P.2d at 928-31.

The same conclusion was reached by the American Bar Association's Standing Committee on Association Standards for Criminal Justice. Commenting on the *mens rea* model, the Committee stated that:

> This approach, which would permit evidence of mental condition on the requisite mental element of the crime but elim-

inate mental nonresponsiblity as an independent, exculpatory doctrine, has been proposed in several bills in Congress and adopted in Montana, Idaho and Utah. The ABA has rejected it out of hand. Such a jarring reversal of hundreds of years of moral and legal history would constitute an unfortunate and unwarranted overreaction to the Hinckley verdict.

American Bar Association, Standing Committee on Association Standards for Criminal Justice, Report to the House of Delegates, August, 1984, Standard 7-6.1, Commentary P. 327.

The State does not contest that the need to establish criminal intent beyond a reasonable doubt is a fundamental principle. Instead the State argues that NRS 193.220 does not interfere with or negate this principle. We disagree. The *mens rea* model has the effect of eliminating the concept of wrongfulness from all crimes, in effect changing the criminal intent to be established regardless of the statutory definition of the offense. This would permit an individual to be convicted of a crime where the State failed to prove an element of the offense beyond a reasonable doubt.

Our decision is consistent with other courts that have considered this issue. In *State v. Strasburg,* 110 P. 1020 (Wash. 1910), the Washington Supreme Court declared unconstitutional a Washington statute that provided that insanity was not a defense to a crime and specifically prohibited the introduction of any evidence on the issue of legal insanity. Similar rationale is found in the case of *Sinclair v. State,* 132 So. 581 (Miss. 1931). The Mississippi statute stated that insanity was not a defense to the crime of murder. The Mississippi Supreme Court determined that the statute was unconstitutional holding that:

> One of the essential ingredients of crime is intent. Intent involves an exercise of the reasoning powers in which the result of the criminal act is foreseen and clearly understood. Another essential element of crime is animus. Animus involves an exercise of reasoning powers, in which the result of the criminal act is recognized as being contrary to the rules of law and justice. If a person is mentally unsound, one or both of these elements may be, and usually are, wanting.

*Sinclair,* 132 So. at 584.

The State contends that the rationale of *Strasburg* and *Sinclair* are inapplicable to the Nevada statutory scheme, because NRS 193.220 specifically permits evidence of insanity to be considered in determining intent, something which was not present in the Washington and Mississippi statutes. Instead, the State argues we should follow the reasoning of the Idaho, Montana and Utah Supreme Courts upholding the constitutionality of their respective *mens rea* model insanity statutes. In each of these cases, the

courts determined that there is no federal constitutional right to assert a defense of insanity. A *mens rea* model statutory scheme is permissible so long as a defendant is allowed to introduce evidence to show he lacked the mental capacity to form the intent to do the act, regardless of whether or not he knew the act was wrong. *State v. Herrera,* 895 P.2d 359 (Utah 1995); *State v. Searcy,* 798 P.2d 914 (Idaho 1990); *State v. Korell,* 690 P.2d 992 (Mont. 1984).[6]

The courts in *Herrera, Searcy* and *Korell* concluded that there is no federal due process right to assert insanity as a defense to criminal culpability. They reasoned that because the definition of legal insanity has been the subject of much debate and change, it does not possess the requisite historical certainty necessary to rise to a fundamental right under the Due Process Clause. *Herrera,* 895 P.2d at 365; *Searcy,* 798 P.2d at 918; *Korell,* 690 P.2d at 1000-01.

These courts also place heavy emphasis on the fact that the United States Supreme Court has never held that a defense of insanity is a fundamental principle under the Due Process Clause. In addition, relying on two instances of obiter dictum, they conclude that the United States Supreme Court would not extend due process protection to the concept of legal insanity. All three cases cite to a brief statement by the United States Supreme Court in *Powell v. Texas,* 392 U.S. 514 (1968) in support of their analysis. In *Powell* the Supreme Court was considering the constitutionality of a statute that made it a crime to be drunk in a public place. The court concluded this was not an unconstitutional status crime. In the opinion, the court stated that:

> We cannot cast aside the centuries-long evolution of the collection of inter-locking and overlapping concepts which the common law has utilized to assess the moral accountability of an individual for his antisocial deeds. The doctrines of *actus reus, mens rea,* insanity, mistake, justification, and duress have historically provided the tools for a constantly shifting adjustment of the tension between the evolving aims of the criminal law and changing religious, moral, philosophical, and medical views of the nature of man. This process of adjustment has always been thought to be the province of the States.

*Powell,* 392 U.S. at 535-36. In addition to this comment from *Powell,* the Idaho, Montana and Utah courts also rely on a single sentence contained in Justice Rehnquist's dissenting opinion in

---

[6]Prior to their abolishment of the defense of insanity, none of these jurisdictions applied the strict M'Naghten standard to determine insanity. Each used a more expansive definition. None of the defendants in these cases would qualify as legally insane under *M'Naghten.*

*Ake v. Oklahoma,* 470 U.S. 68 (1985). "It is highly doubtful that due process requires a State to make available an insanity defense to a criminal defendant, but in any event if such a defense is afforded the burden of proving insanity can be placed on the defendant." *Ake,* 470 U.S. at 91.

While Chief Justice Rehnquist's statement certainly supports the decisions in *Herrera, Searcy* and *Korell,* the same cannot be said of Justice Marshall's commentary in *Powell.* When read in context, the comments in *Powell* support the Supreme Court's longstanding policy to generally permit the states to determine the details of how to implement well-established doctrines. In other words, how a state chooses to present the issue of legal insanity is left up to state law. *Powell* cannot be read to stand for the proposition that the concept of legal insanity, *i.e.,* an inability to form the requisite *mens rea,* is not a fundamental principle of our jurisprudence entitled to protection under the Due Process Clause.

The ideas embodied in *Powell* regarding giving the states discretion on the procedural method for determining legal insanity are also expressed in *Leland v. Oregon,* 343 U.S. 790 (1952). In *Leland,* the High Court upheld Oregon's legal insanity statute. The statute required that a defendant prove legal insanity beyond a reasonable doubt. Oregon also followed the M'Naghten rule. The defendant was challenging Oregon's requirement that he prove, as an affirmative defense, that he was legally insane beyond a reasonable doubt. This, he argued, was an impermissible shift to the defendant of the burden of proof. The Supreme Court found that this scheme did not violate "generally accepted concepts of basic standards of justice" because the state still had the burden to prove every element of the crime beyond a reasonable doubt. *Leland,* 343 U.S. at 799.

In reaching this conclusion, the High Court's discussion of legal insanity implies that it viewed the issues of legal insanity and *mens rea* to be intertwined. Due process requires that the prosecution prove the *mens rea,* or intent, of a crime beyond a reasonable doubt. Legal insanity negates criminal intent, but how the issue of legal insanity is raised is a procedural issue left to the judgment of the individual state and requiring a defendant to establish legal insanity as an affirmative defense was a permissible method for accomplishing this task. While the Court did not adopt any one procedure or test for establishing legal insanity, it implied that legal insanity is a fundamental principle of our system of justice. *Leland,* 343 U.S. at 799.

It is also interesting to note that the Supreme Court in *Leland* did not withdraw from any of the language in *Davis v. United States* that discusses the importance of legal insanity. The Court only found that the procedure for litigating the issue of legal insanity set forth in *Davis* was not constitutionally mandated. In

*Davis,* Justice Harlan stated that:

> We are unable to assent to the doctrine that in a prosecution for murder, the defence being insanity, and the fact of the killing with a deadly weapon being clearly established, it is the duty of the jury to convict where the evidence is equally balanced on the issue as to the sanity of the accused at the time of the killing. On the contrary, he is entitled to an acquittal of the specific crime charged if, upon all the evidence, there is reasonable doubt whether he was capable in law of committing crime.
>
> No one, we assume, would wish either the courts or juries, when trying a case of murder, to disregard the humane principle, existing at common law and recognized in all the cases tending to support the charge of the court below, that "to make a complete crime cognizable by human laws, there must be both a will and an act";
>
> . . . .
>
> Although the killing of one human being by another human being with a deadly weapon is presumed to be malicious until the contrary appears, yet, "in order to constitute a crime, a person must have intelligence and capacity enough to have a criminal intent and purpose; and if his reason and mental powers are either so deficient that he has no will, no conscience, or controlling mental power, or if, through the overwhelming violence of mental disease, his intellectual power is for the time obliterated, he is not a responsible moral agent, and is not punishable for criminal acts." Com. v. Rogers, 7 Metc. (Mass.) 501. Neither in the adjudged cases nor in the elementary treatises upon criminal law is there to be found any dissent from these general propositions.

*Davis,* 160 U.S. at 484-85.

The commentary contained in *Powell* is merely a reaffirmation of the general policy stated by Justice Cardozo in *Snyder v. Massachusetts,* 291 U.S. 97 (1934) that a state "is free to regulate the procedure of its courts in accordance with its own conception of policy and fairness, unless in so doing it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Snyder,* 291 U.S. at 105.

Moreover, the significance of the isolated comments in *Powell* and *Ake* becomes more tenuous in the face of other statements of the High Court affirming the importance of legal insanity as a defense to criminal culpability. Justice O'Connor relied upon the protections afforded by the defense of insanity when determining

that the imposition of the death penalty upon a mentally retarded defendant did not constitute cruel and unusual punishment. The Court acknowledged that there is a constitutional prohibition against executing a legally insane person, but that mental retardation did not equate to legal insanity. Further, Justice O'Connor noted that there were sufficient safeguards to ensure that a mentally incompetent individual who was incapable of forming the requisite *mens rea* would not be convicted, among them the insanity defense.

> The common law prohibition against punishing "idiots" for their crimes suggests that it may indeed be "cruel and unusual" punishment to execute persons who are profoundly or severely retarded and wholly lacking the capacity to appreciate the wrongfulness of their actions. Because of the protections afforded by the insanity defense today, such a person is not likely to be convicted or face the prospect of punishment.

*Penry v. Lynaugh,* 492 U.S. 302, 333 (1989). Given the Supreme Court's discussion of insanity in *Leland, Morissette* and *Penry,* we cannot agree with the analysis of federal law contained in the majority opinions of *Herrera, Searcy* and *Korell.*

Finally we note that these opinions appear to assume that wrongfulness, that is the knowledge that you are acting in an unauthorized manner, is not a necessary component of the crime of murder. In fact, *Herrera* specifically indicates that the only element of intent in murder is the intent to kill a human being. It is this approach that distinguishes the *mens rea* model.[7] But murder is generally not defined as just the killing of another human being. In Nevada, as in most states, murder requires something more than the intent to kill. Nevada defines murder as the *"unlawful* killing of a human being, with malice aforethought, either express or implied . . ." NRS 200.010 (emphasis added). Malice is defined in NRS 200.020. Express malice involves the deliberate intention to *unlawfully* take away the life of a fellow creature, while malice is implied when, for example, the circumstances of the killing show an abandoned and malignant heart.

An individual who labors under the total delusion that they are a soldier in a war and are shooting at enemy soldiers is not capable of forming the intent to kill with malice aforethought. His delusional state prohibits him from forming the requisite *mens*

---

[7]The statutes in Montana and Utah use words such as "purposely" or "knowingly" to define criminal homicide, while Idaho's statute refers to malice. Arguably, Montana and Utah may only require a person to form an intent to kill a human being to be guilty of murder, however the dissents in *Korell* and *Herrera* dispute that this is the case.

*reas,* because he believes that his killing is authorized by law. He is legally insane under *M'Naghten.* Anytime a statute requires something more than the intent to commit a particular act, then legal insanity must be a viable defense to the crime and involves both tests under the M'Naghten rule.

We conclude that legal insanity is a well-established and fundamental principle of the law of the United States. It is therefore protected by the Due Process Clauses of both the United States and Nevada Constitutions. The Legislature may not abolish insanity as a complete defense to a criminal offense. Thus the provisions of S.B. 314 abolishing the insanity defense are unconstitutional and unenforceable.

The Legislature is free to decide what method to use in presenting the issue of legal insanity to a trier of fact, *i.e.,* as an affirmative defense or rebuttable presumption of sanity. It may also determine that legal insanity be proven by the defendant by any one of the established standards. But it cannot abolish legal insanity or define it in such a way that it undermines a fundamental principle of our system of justice. Historically, the *mens rea* of most crimes, particularly specific intent crimes, incorporates some element of wrongfulness as that term is used in *Lewis* and *M'Naghten.* The Legislature can only eliminate this concept of wrongfulness if it redefines the crime itself, in other words, if it chooses to make the act, regardless of the mental state, the crime. Thus murder could simply be defined as the killing of a human being. But so long as a crime requires some additional mental intent, then legal insanity must be a complete defense to that crime.

Turning to the remaining provisions of S.B. 314, which created a plea of "guilty but mentally ill," repealed the criminal commitment statutes and abolished the plea of not guilty by reason of insanity, while these provisions might be construed in a constitutional fashion, they are inextricably intertwined with the provisions designed to abolish the insanity defense. To enforce one without the other would be to create unintended consequences and frustrate the very object of the act; that is, to make it more difficult to be acquitted on the basis of legal insanity. We agree with the dissent that the act can be construed in a constitutional fashion and the usual rules of statutory constructions would require such a result. However, there is an exception to this general rule. In *Binegar v. District Court,* 112 Nev. 544, 915 P.2d 889 (1996), we noted that when provisions of an act cannot be severed with-

out defeating the whole scope and object of the law, then the entire law should be stricken. To construe the laws in the manner urged by the dissent would broaden, not restrict, the scope of legal insanity in our jurisprudence. Use of the "sound mind and discretion" language contained in NRS 193.200, without reference to our prior caselaw involving *M'Naghten,* would allow individuals with mental illnesses not amounting to legal insanity under *M'Naghten* to argue they did not possess the sound mind and discretion to form the intent to commit the crime. As this would be in direct contradiction to the intent of the legislation, we conclude that S.B. 314 should be rejected in its entirety. All prior versions of the statutes amended or repealed by S.B. 314 remain in full force and effect. *Johnson v. Goldman,* 94 Nev. 6, 575 P.2d 929 (1978) (because the statute permitting peremptory challenge to judge upon payment of fee was unconstitutional, the procedures which previously governed judicial recusal and which were purportedly repealed by the Act in question remained in effect); *C.V.L. Co. v. District Court,* 58 Nev. 456, 83 P.2d 1031 (1938) (an unconstitutional statute has no effect and does not repeal a prior statute).

IV. *Clarification of* M'Naghten

Because of the confusion over the application of *M'Naghten* evidenced in the legislative hearings on S.B. 314, we take this opportunity to clarify our previous case law. To qualify as being legally insane, a defendant must be in a delusional state such that he cannot know or understand the nature and capacity of his act, or his delusion must be such that he cannot appreciate the wrongfulness of his act, that is, that the act is not authorized by law. So, if a jury believes he was suffering from a delusional state, and if the facts as he believed them to be in his delusional state would justify his actions, he is insane and entitled to acquittal. If, however, the delusional facts would not amount to a legal defense, then he is not insane. Persons suffering from a delusion that someone is shooting at them, so they shot back in self-defense are insane under *M'Naghten.* Persons who are paranoid and believe that the victim is going to get them some time in the future, so they hunt down the victim first, are not.

We also take this opportunity to clarify the proper use of lay opinion in cases involving legal insanity. Legal insanity has a precise and extremely narrow definition in Nevada law. To allow a lay witness to testify that someone is "insane" assumes that the witness fully understands the complexity of the insanity defense as outlined in *M'Naghten* and *Lewis.* A lay witness can certainly

testify as to their observations of a defendant's behavior and can use other words, such as "crazy" or "abnormal." But a lay witness should not be permitted to use the word "insane" since that is a term of art. We expressly disapprove of any language in our case law that holds to the contrary.

In addition we stress the need for experts and juries to be correctly advised on the M'Naghten standard. The ability to understand right from wrong under *M'Naghten* is directly linked to the nature of the defendant's delusional state. Delusional beliefs can only be the grounds for legal insanity when the facts of the delusion, if true, would justify the commission of the criminal act. This is a very narrow standard. Unless a defendant presents evidence that complies with this standard, he or she is not entitled to have the jury instructed on the issue of insanity. We expressly overrule *Aldana* to the extent it implies that any evidence of mental illness or aberration requires the jury to be instructed on the issue of legal insanity. Evidence that does not rise to the level of legal insanity may, of course, be considered in evaluating whether or not the prosecution has proven each element of an offense beyond a reasonable doubt, for example in determining whether a killing is first- or second-degree murder or manslaughter or some other argument regarding diminished capacity.

We understand that few people will qualify as legally insane under the M'Naghten rule. However, the adoption of a more expansive definition of legal insanity is not required by the Federal or Nevada Constitutions and is therefore a legislative, not a judicial prerogative.

## V. *Application to Finger*

Having determined that S.B. 314 is unconstitutional, we must now examine the consequences of our ruling upon Finger. Finger has a constitutional right to present evidence demonstrating that he was legally insane under the M'Naghten standard when he killed his mother. However, Finger does not have a constitutional right to enter a plea of "not guilty by reason of insanity," or to procedurally litigate legal insanity as an affirmative defense. But, because the legislative history involving S.B. 314 and the amendment of NRS 193.220 led Finger to believe he would have been prohibited from arguing legal insanity as defined by *M'Naghten,* his plea of "guilty, but mentally ill" was not knowingly entered. He is therefore entitled to withdraw his plea of guilty but mentally ill, enter a plea of not guilty in accordance with this opinion and proceed to trial. On the limited record presented to us, it appears that Finger killed his mother because of his delusional

belief that she was conspiring with others to kill him and he needed to kill her before she could carry out her scheme. If this was his delusional belief, Finger would not qualify as legally insane. This is because there is no evidence that, in his delusion, he believed he was in imminent danger which, if true, would justify self-defense. However, we are mindful of the fact that the record is incomplete. Finger never fully developed his expert testimony on the record. Therefore, there may be additional evidence to support a M'Naghten defense. We therefore remand this matter to the district court for further proceedings consistent with this opinion.

## CONCLUSION

Neither the Federal nor the State Constitutions mandate that the issue of insanity be procedurally litigated as an affirmative defense. However, an individual who lacks the mental capacity to form the requisite intent or *mens rea* of a criminal offense cannot be convicted of that offense without violating the due process provisions of the United States and Nevada Constitutions. Insanity is a mental condition that interferes with the ability of a person to form criminal intent. Individuals are considered to be legally insane when their mental condition rises to a level so as to relieve them of criminal culpability for their actions because they are incapable of developing the necessary *mens rea*. Where the *mens rea* of a crime requires that defendants understand the nature and consequences of their conduct and that the conduct is wrong, then legal insanity is established when one of these two elements is missing. This is the M'Naghten rule. The Legislature cannot abolish the concept of legal insanity. Therefore Finger has the right to argue that he lacked the required *mens rea* to commit the crime of murder and is legally insane. Because he entered his plea of ''guilty, but mentally ill'' under the assumption he could not raise the issue of legal insanity at trial, his plea was not knowingly entered. Accordingly, we remand this matter to the district court for further proceedings consistent with this opinion.

YOUNG and AGOSTI, JJ., concur.

LEAVITT, J., concurring:

I agree with the majority that the requirement of a mentally ill defendant to plead guilty but mentally ill deprives a defendant of liberty without due process of law and is in violation of the Fourteenth Amendment. The attempt by the Legislature to wipe away more than a century of criminal jurisprudence tramples on the due process rights of mentally unsound defendants and is unconstitutional.

The new procedure conflicts with several Nevada statutes.

The criminal justice system does not punish persons unable to form the intent necessary to commit a crime. Under current Nevada law, to constitute a crime there must be a joint operation of two essential elements, an act forbidden by law and an intent to do the act.[1] The intent with which an act is done is shown by the facts and circumstances of the case and the sound mind and discretion of the person accused.[2] A person of sound mind is one who knows the distinction between good and evil.[3]

A defendant entering a plea of guilty to a criminal offense must do so voluntarily, knowingly and with an understanding of the elements of the crime to which the person is admitting guilt.[4] Additionally, a defendant entering a plea of guilty waives three valuable constitutional rights: the privilege against self-incrimination, the right to trial by a jury, and the right to confront accusers.[5] Further, a defendant must understand the consequences of pleading guilty.[6] A defendant's federal constitutional rights are involved when a plea of guilty is entered in a state criminal proceeding.[7] If a defendant's mental illness at the time of the entry of the plea prevented the defendant from understanding the consequences of such action, the plea is involuntarily entered and must be set aside. A criminal defendant may not plead guilty unless he does so competently and intelligently.[8] Complicating the problem is the rule that when a person enters a plea of guilty, that person "may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea."[9]

A person who has pleaded guilty but mentally ill is incarcerated in the Nevada State Prison. Persons who may be incapable of committing crime because of mental illness should not be placed in prison with criminals who intentionally, willfully and knowingly commit crime. There is a clear difference between a person who may be incompetent and a mentally capable defendant. The criminal justice system has always recognized that dis-

---

[1] NRS 193.190.

[2] NRS 193.200.

[3] NRS 193.210.

[4] *Love v. State,* 99 Nev. 147, 147-48, 659 P.2d 876, 877 (1983).

[5] *Higby v. Sheriff,* 86 Nev. 774, 781, 476 P.2d 959, 963 (1970).

[6] *Ramey v. State,* 99 Nev. 264, 265, 661 P.2d 1292, 1292 (1983).

[7] *Boykin v. Alabama,* 395 U.S. 238, 243 (1969), *superceded by statute on other grounds as stated in United States v. Gomez-Cuevas,* 917 F.2d 1521 (10th Cir. 1990).

[8] *Godinez v. Moran,* 509 U.S. 389, 396 (1993).

[9] *Webb v. State,* 91 Nev. 469, 470, 538 P.2d 164, 165 (1975) (quoting *Tollett v. Henderson,* 411 U.S. 258, 267 (1973)).

tinction. The new procedure makes the status of mental illness a crime, by confining a person who cannot form the necessary intent to commit a crime and whose only "crime" is mental illness. Such inflicted punishment is cruel and unusual in violation of the 8th Amendment of the U.S. Constitution.

The legislative scheme as set forth in S.B. 314[10] must be set aside, and the law as it existed prior to its enactment be reinstated.

SHEARING, J., with whom MAUPIN, C. J., and ROSE, J., agree, dissenting:

I would affirm the judgment of conviction adjudicating Frederick Finger guilty of second-degree murder but mentally ill. I do not agree that he has the right to plead not guilty by reason of insanity, as he asserts, nor do I agree that the Nevada statutory scheme violates the Due Process Clause of either the United States Constitution or the Nevada Constitution.

Finger pleaded guilty but mentally ill after the court refused to allow his plea of not guilty by reason of insanity. Under the Nevada statutory scheme, no one is obligated to plead guilty. Every person accused of a crime has a right to a trial. When an accused pleads guilty, he or she does so strictly voluntarily. The court is obligated to canvass the accused to make sure that the plea is voluntary. Finger argues that NRS 174.035(3), the statute which authorizes the guilty but mentally ill plea, provides an incentive for pleading guilty, because of the fear of what could happen at trial. That is the incentive for most pleas and does not violate any constitutional provision.

If the accused refuses to plead guilty or guilty but mentally ill or nolo contendere, the court must enter a plea of not guilty[1] and the accused proceeds to trial. The same result occurred with the previous plea of not guilty by reason of insanity; the case proceeded to trial. At trial, the defendant had to prove insanity. Under the present statutory scheme, at trial, the State must prove that the defendant had the necessary mental state.

In 1995 the Nevada Legislature abolished the plea of not guilty by reason of insanity and substituted a plea of guilty but mentally ill. The majority concludes that the new Nevada statutory scheme on the culpability of mentally impaired individuals is unconstitutional because it does not take into account the defendant's criminal intent or *mens rea*. The Nevada statutory scheme does take into account the defendant's mental state to the extent necessary to comply with substantive due process.

---

[10]S.B. 314, 67th Leg. (Nev. 1995), amending NRS 174.035, 193.220 and 194.010 and repealing 175.521.

[1]NRS 174.035(5).

At trial, the State must prove every element of the offense charged beyond a reasonable doubt, including the element of intent, whether general or specific. The defendant may raise the issue of his or her mental state either by defense evidence or by attacking the prosecution evidence of intent or mental state. The Legislature left intact two provisions which make it very clear that the requisite mental state must be proven. NRS 193.190 provides:

> In every crime or public offense there must exist a union, or joint operation of act and intention, or criminal negligence.

NRS 193.200 provides:

> Intention is manifested by the circumstances connected with the perpetration of the offense, and the sound mind and discretion of the person accused.

Furthermore, the accused is also entitled to an instruction to the jury in accordance with NRS 194.010 which provides in relevant part:

> **Persons capable of committing crimes.** All persons are liable to punishment except those belonging to the following classes:
>
> . . . .
>
> 4.   Persons who committed the act or made the omission charged *under an ignorance or mistake of fact, which disproves any criminal intent,* where a specific intent is required to constitute the offense.
>
> 5.   Persons who committed the act charged without being conscious thereof.
>
> 6.   Persons who committed the act or made the omission charged, through misfortune or by accident, when it appears that there was no evil design, intention or culpable negligence.

(Emphasis added.) This statute clearly requires the jury or other fact finder to take into account the criminal intent of the defendant. Thus, a person who is acting under a delusion or other mental state negating intent to commit a crime would not be convicted under the Nevada statutes. Neither would a person who acted with no "evil design, intention or culpable negligence."[2]

The Legislature was even more explicit in pointing out that an accused's mental state is to be considered in the determination of guilt. NRS 193.220 provides:

> **When insanity or voluntary intoxication may be considered.** No act committed by a person while in a state of insan-

---

[2]NRS 194.010(6).

ity or voluntary intoxication shall be deemed less criminal by reason of his condition, but whenever the actual existence of any particular purpose, motive or intent is a necessary element to constitute a particular species or degree of crime, the fact of his insanity or intoxication may be taken into consideration in determining the purpose, motive or intent.

Under the present Nevada law, the mental condition of an accused does not automatically absolve anyone of a crime, but it is a factor to consider in determining whether every element of the crime charged has been proven. The Due Process Clauses of the United States and Nevada Constitutions require no more.

The words of Justice Felix Frankfurter in 1952 on the issue of what culpability is required to turn homicide into murder are still apt today.

The tests by which such culpability may be determined are varying and conflicting. One does not have to echo the scepticism uttered by Brian, C.J., in the fifteenth century, that 'the devil himself knoweth not the mind of men' to appreciate how vast a darkness still envelops man's understanding of man's mind. Sanity and insanity are concepts of incertitude. They are given varying and conflicting content at the same time and from time to time by specialists in the field. Naturally there has always been conflict between the psychological views absorbed by law and the contradictory views of students of mental health at a particular time. At this stage of scientific knowledge it would be indefensible to impose upon the States, through the due process of law which they must accord before depriving a person of life or liberty, one test rather than another for determining criminal culpability, and thereby to displace a State's own choice of such a test, no matter how backward it may be in the light of the best scientific canons.[3]

The United States Supreme Court has clearly indicated that it will not impose any particular test for determining culpability for crimes.

The safeguards built into the Nevada statutory scheme for determining culpability clearly comply with the standard for due process set by the courts. The Court in *Leland v. Oregon* was considering whether a test other than M'Naghten was required.[4] The Court pointed out that the choice of a test of legal sanity involves not only scientific knowledge but also questions of basic policy as

---

[3]*Leland v. Oregon,* 343 U.S. 790, 803 (1952) (Frankfurter dissenting on the issue of burden of proof only).

[4]*M'Naghten's Case,* 8 Eng. Rep. 718, 722 (1843).

to the extent to which that knowledge should determine criminal responsibility.[5] The Court implied that because of the wide disagreement among those who have studied the question of criminal responsibility and the policy questions involved, the Court would basically defer to the states on this matter.

The argument that Finger makes in support of the insanity defense and the M'Naghten test is largely based on the lengthy history of *M'Naghten*. Yet it has long been recognized that the term "insanity" and the M'Naghten test for "insanity" under the criminal law have historically been terms of art with very little relation to medical or behavioral science. The cases applying the M'Naghten test are replete with outdated words like "lunatic" and "insane" which have little relationship to modern knowledge about human behavior or mental problems, processes and treatments. The Nevada Legislature has conformed the law to the more modern views that psychiatry cannot offer sufficient certainty to produce reasonable and consistent accuracy in resolving questions of criminal responsibility and that it is therapeutically desirable to treat deviants as responsible for their conduct rather than as involuntary victims playing a sick role.[6] The jury makes the ultimate determination as to intent in determining guilt or innocence. There is no requirement for a separate plea or finding of not guilty by reason of insanity. When determining whether a statutory scheme is consistent with due process, we must look anew at the fundamental precepts of due process and not blindly follow historical concepts.

The majority seems to focus on the defendant's knowledge of the wrongfulness of his act under *M'Naghten* as being an essential element for constitutionality. Even though the Nevada statutory scheme does require a knowledge of wrongfulness, I disagree that it must do so. The United States Supreme Court has never articulated a general constitutional doctrine of insanity requiring a knowledge of wrongfulness.[7] The Supreme Court in *Powell v. Texas* stated:

> We cannot cast aside the centuries-long evolution of the collection of interlocking and overlapping concepts which the common law has utilized to assess the moral accountability of an individual for his antisocial deeds. The doctrines of *actus reus, mens rea,* insanity, mistake, justification, and duress have historically provided the tools for a constantly

[5] *Id.* at 801.

[6] 1 National Commission on Reform of Federal Criminal Laws, Working Papers, 248-251 (1970).

[7] *Powell v. Texas,* 392 U.S. 514, 535 (1968) (affirming conviction of an alcoholic for public intoxication).

> shifting adjustment of the tension between the evolving aims of the criminal law and changing religious, moral, philosophical, and medical views of the nature of man. This process of adjustment has always been thought to be the province of the States.
>
> Nothing could be less fruitful than for this Court to be impelled into defining some sort of insanity test in constitutional terms. . . . [F]ormulating a constitutional rule would reduce, if not eliminate, that fruitful experimentation, and freeze the developing productive dialogue between law and psychiatry into a rigid constitutional mold. It is simply not yet the time to write the Constitutional formulas cast in terms whose meaning, let alone relevance, is not yet clear either to doctors or to lawyers.[8]

Furthermore, the United States Supreme Court has recognized that it is constitutionally permissible to enact strict liability crimes.[9] In *Lambert v. California,* the Court stated: "There is wide latitude in the lawmakers to declare an offense and to exclude elements of knowledge and diligence from its definition."[10]

As the majority notes, the Due Process Clause requires protection of those principles deemed fundamental to the American scheme of justice. Procedural fairness is one of those fundamental principles. The Nevada statutory scheme for defendants who were mentally ill at the time of the alleged crime assures the same procedural due process as other defendants receive.

A substantive fundamental principle is that no one be held criminally culpable if they are so mentally impaired that they did not know what they were doing or had no control over what they were doing. The Nevada statutes do not hold someone criminally culpable if they do not know what they are doing or have no control. In none of the examples cited by the majority in which the M'Naghten "insanity" test would exonerate the defendant, would the defendant be convicted under the present Nevada statutes. These statutes fully conform to due process principles and should be upheld.

The majority also acknowledges that the court could construe NRS 193.220 as simply a change in the procedure by which the issue of legal insanity is presented to the jury, rather than a change in the substantive law of insanity. If it can do so, it is obligated to do so. "Where a statute is susceptible to both a constitutional and an unconstitutional interpretation, this court is

[8]*Id.* at 535-537.

[9]*Lambert v. California,* 355 U.S. 225 (1957).

[10]*Id.* at 228.

obliged to construe the statute so that it does not violate the constitution."[11] I disagree with the proposition that the Legislature may not change the substantive law of insanity to conform to more modern knowledge of human behavior. However, I stress that even if the majority believes that criminal intent is constitutionally required, it should, consistent with the rules governing statutory construction, interpret the entire statutory scheme to require that criminal intent, since it is perfectly consistent with the Nevada statutory scheme. The majority has failed to do so, and has thereby failed to honor the long-established principle of statutory interpretation.

I do not believe that the Legislature has enacted a statute which violates the Due Process Clause of either the United States or the Nevada Constitutions. Finger's judgment of conviction should be affirmed.

---

[11]*Whitehead v. Comm'n on Jud. Discipline,* 110 Nev. 874, 883, 878 P.2d 913, 919 (1994) (citing *Sheriff v. Wu,* 101 Nev. 687, 689-90, 708 P.2d 305 (1985)).